```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3
                          - - -
 4
     UNITED STATES OF AMERICA,      :      Criminal Action
 5                                  :
               Plaintiff,           :
 6                                  :
               v.                   :
 7                                  :
     THOMAS J. SMITH,               :
 8                                  :
               Defendant.           :      No. 08-08-GMS
 9
                          - - -
10
                     Wilmington, Delaware
11                   Thursday, May 29, 2008
                         10:16 a.m.
12
                          - - -
13
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
14
     APPEARANCES:
15
               SHAWN EDWARD MARTYNIAK, ESQ.
16             Special Assistant United States Attorney

17                            Counsel for Government

18             KEIR BRADFORD, ESQ.
               Federal Public Defender's Office
19
                              Counsel for Defendant
20
                          - - -
21

22

23

24

25
```

| | |
|---|---|
| 1 | THE COURT:  Good morning.  Please be seated. |
| 2 | MR. MARTYNIAK:  Good morning, Your Honor.  We |
| 3 | are here this morning to hear an evidentiary hearing in the |
| 4 | matter of United States versus Thomas Smith, 08-08.  Shawn |
| 5 | Martyniak representing the government, Your Honor. |
| 6 | The government is ready to proceed. |
| 7 | THE COURT:  Good morning, Ms. Bradford. |
| 8 | Good morning, Mr. Smith. |
| 9 | Are you ready? |
| 10 | MS. BRADFORD:  I am, Your Honor.  Before we |
| 11 | proceed, I would just ask for a motion to sequester all |
| 12 | witnesses. |
| 13 | THE COURT:  So ordered. |
| 14 | MR. MARTYNIAK:  Your Honor, the government calls |
| 15 | Officer Rinehart. |
| 16 | THE COURT:  Okay. |
| 17 | ... MICHAEL RINEHART, having been duly sworn as |
| 18 | a witness, was examined and testified as follows ... |
| 19 | DIRECT EXAMINATION |
| 20 | BY MR. MARTYNIAK: |
| 21 | Q.    Officer Rinehart, you are clearly a Wilmington Police |
| 22 | Officer.  Correct? |
| 23 | A.    Yes, sir. |
| 24 | Q.    As a Wilmington Police Officer, what are your job |
| 25 | duties? |

Rinehart - direct

1    A.    Patrol functions, basically patrol assigned districts

2    and conduct stops, motor vehicle stops, enforce city rules

3    and regulations, as well as state laws.

4    Q.    How long have you been a Wilmington Police Officer?

5    A.    Approximately three years.  It will be three years

6    July 5th.

7    Q.    Have you been a patrol officer since you were hired?

8    A.    I have.

9    Q.    Do you recall if you were working on January 8th of

10   2008?

11   A.    Yes, sir, I was.

12   Q.    Were you working as a patrol officer, in that

13   capacity, on that date?

14   A.    Yes, sir, I was.

15   Q.    Do you recall what times on January 8th you were

16   working or what shift?

17   A.    11:00 in the p.m. until 08 a.m.

18   Q.    And did you have a partner working with you?

19   A.    I did.  Officer Muziol.

20   Q.    Is Officer Muziol still your partner?

21   A.    No.  I have since trained, I am training another

22   rookie now, I guess you could say.

23   Q.    Do you recall a specific area or location that you

24   were assigned to with Officer Muziol on January 8th of 2008?

25   A.    We were assigned to the 16th District, which

Rinehart - direct

1    encompasses the 600 block of Madison Street.

2    Q.    And do you recall if you were involved in the

3    investigation into a Thomas Smith?

4    A.    Yes, sir, I was.

5    Q.    Did you meet Thomas Smith that evening?

6    A.    Yes, I did.

7    Q.    Is the Thomas Smith that you met that evening in the

8    court today?

9    A.    Yes, he is.

10   Q.    Can you describe for the Judge what he is wearing and

11   where he is seated?

12   A.    He is the male subject at the defense table wearing

13   all orange.

14          MR. MARTYNIAK:  May the record reflect that he

15   has identified the defendant?

16          THE COURT:  Yes.

17   BY MR. MARTYNIAK:

18   Q.    On January 8th of 2008 were you patrolling the 600

19   block of North Madison Street?

20   A.    Yes.

21   Q.    What were you wearing on that day?

22   A.    Full uniform.

23   Q.    Just like today?

24   A.    Correct.

25   Q.    How about Officer Muziol?

1    A.    Full uniform as well.

2    Q.    What type of vehicle were you driving?

3    A.    Fully marked Wilmington Police vehicle.

4    Q.    You indicated that that was your assigned district?

5    A.    That is correct.

6    Q.    Are you familiar with that area?

7    A.    I am.

8    Q.    Would you consider that a high-crime area?

9    A.    Yes.

10    Q.    Why would you consider it that?

11    A.    There is criminal activity in that area constantly,

12    all hours of the day and night, from drug sales to

13    shootings, homicides.  You name it, that area has it.

14    Q.    Was it true of that area on January 8th of 2008 as

15    well?

16    A.    Yes.

17    Q.    Do you recall what the weather was like on January

18    8th?

19    A.    I believe it was approximately 45 degrees outside,

20    calm winds, clear.

21    Q.    And in the area that you came into contact with Thomas

22    Smith, what was the lighting like in that area?

23    A.    It was very well-illuminated.  There were numerous

24    residential lights on as well as DP&L, I guess,

25    streetlights.

Rinehart - direct

1              THE COURT:  Officer, what is this area of the

2    city called?  It's North Wilmington?

3              THE WITNESS:  We refer to it as the Center City

4    District.

5              THE COURT:  The Center City District?

6              THE WITNESS:  Yes, sir.

7              MR. MARTYNIAK:  Your Honor, may I approach the

8    witness?

9              THE COURT:  Yes, you may.

10   BY MR. MARTYNIAK:

11   Q.    Officer, I have handed you a map.  Could you describe

12   for the Judge what is that a map of?

13   A.    This is a map of the 600 block of Monroe as well as

14   Madison Street.

15   Q.    Is that the area in which you stopped the defendant?

16   A.    It is.

17   Q.    Is that map a fair and accurate depiction of the area

18   as you know it to be?

19   A.    Yes.  Minus for vegetation on the trees was not there

20   the night that this occurred.

21   Q.    If you would -- do you have a pen with you?

22   A.    Yes, I do.

23   Q.    Could you mark your location and the defendant's

24   location when you and Officer Muziol first contacted him?

25   A.    Just an X, sir?

Rinehart - direct

1   Q.    For your location, I guess, if you would, write a P.

2   And for the defendant's location mark a D.

3   A.    Okay.

4   Q.    Could you describe for the Judge where those locations

5   are in relation to the relative street locations?

6   A.    We were about midway between West Sixth Street and

7   West Seventh Street, adjacent to the basketball courts in

8   the park there, Your Honor.

9   Q.    Where was the defendant located?

10  A.    He was walking on the west side sidewalk.

11  Q.    At which location?

12  A.    On Madison Street, 600 block of Madison Street.

13  Q.    Was he closer to Sixth Street or Seventh Street?

14  A.    Closer to Seventh.

15  Q.    So your patrol vehicle -- who was driving?

16  A.    Officer Muziol.

17  Q.    Officer Muziol's patrol vehicle was about in the

18  center of North Madison -- I am sorry, the center of the

19  street on North Madison about between Sixth and Seventh

20  Street?

21          THE COURT:  I guess he should say where the

22  vehicle was.  That's a leading question.

23          MR. MARTYNIAK:  Yes, Your Honor.

24  BY MR. MARTYNIAK:

25  Q.    If you could describe where the vehicle was located

Rinehart - direct

1    when Officer Muziol -- who came into contact with the

2    defendant first?

3    A.    Officer Muziol came into contact with the defendant

4    first.  We were traveling north on Madison Street from Sixth

5    Street.  And we were just basically maintaining a safe

6    distance on both sides of the vehicle.  It is a one-way

7    roadway.

8    Q.    Where was the vehicle located between Sixth and

9    Seventh Street?

10   A.    About midway.  It was stopped about midway up the

11   block.

12   Q.    You earlier stated that the defendant was located

13   closer to Seventh Street?

14   A.    Correct.  He was walking southbound.

15   Q.    And did you or Officer Muziol attempt to stop the

16   defendant?

17   A.    Officer Muziol did attempt to stop the defendant.

18   Q.    Can you explain why you attempted to stop this

19   particular individual?

20   A.    We had been instructed by our Lieutenant, due to

21   recent criminal activity in that area, to give that area

22   special attention, high-visibility patrols, to stop and

23   identify anyone that was out walking in that area, and to

24   just basically make our presence known.

25            We observed the defendant walking southbound.

Rinehart - direct

1    He was the only subject out walking.  I guess it was about

2    3:00 in the morning, about 3:15.  We stopped to speak with

3    him to find out who he was.

4    Q.    Can you describe that encounter for the Judge?

5    A.    Yes, I can.  We observed him walking south.  He had

6    his hands in his pockets, which, through training and

7    experience of mine in the past, I have learned that subjects

8    sometimes can carry illegal narcotics or firearms.  They

9    hold onto them through their clothing.

10              But Officer Muziol stopped.  He asked the

11   defendant if he had any ID.  The defendant stated, No, at

12   which time Officer Muziol asked the defendant where he was

13   heading.  He said he was heading to his girl's house.  And

14   at this whole time I am in the passenger seat of the

15   vehicle, and I was leaning down, just listening to the

16   conversation.

17   Q.    Had Officer Muziol asked the defendant to stop?

18   A.    No.

19   Q.    What exactly did he say?

20   A.    Just said, Can I talk to you for a second?  The

21   defendant stopped.

22              THE COURT:  Officer -- that's fine.

23              I will leave it there.  Continue.

24              THE WITNESS:  Said, May I talk to you for a

25   second?  Defendant stopped.  Officer Muziol said, Do you

Rinehart - direct

1    have any identification?  He said no.

2    BY MR. MARTYNIAK:

3    Q.    After he says no, what happened?

4    A.    Officer Muziol asked him, Where are you heading?  He

5    said, I am heading to my girl's house.  There was a brief

6    pause.  Officer Muziol said, I think, if I recall correctly,

7    Officer Muziol again asked, Where is your girl's house?  And

8    the defendant's response was again, I am heading to my

9    girl's house.

10   Q.    In which direction was he headed?

11   A.    Southbound.

12   Q.    And what was Officer Muziol's response to that

13   particular encounter?

14   A.    Officer Muziol, after asking the question a couple

15   times, getting the same response, asked the defendant to

16   come place his hands on the hood of the car so we could

17   further identify him, because at that point we were both

18   kind of like, we didn't know what was going on, why he kept

19   giving us the same answer to different questions.

20   Q.    During that period did you notice anything peculiar

21   about the defendant?

22   A.    I noticed that, through my training and experience, I

23   noticed that he would not turn his right side towards my

24   patrol vehicle.  He constantly kept his right side pointing

25   towards the park, or his right side toward the park, left

Rinehart - direct

1    side towards us.

2             Also, as he pointed south with his left hand,

3    when he put his left hand back down, again I could only see

4    from probably about waistline down, maybe because I am in

5    the passenger seat of the vehicle, I noticed that his left

6    hand was shaking and he appeared to be a little nervous.

7    Q.    Did you say anything to Officer Muziol about that?

8    A.    When I saw his left hand shaking, it heightened my, I

9    guess you could say my suspicion as to what was going on.

10   And I whispered to Bart, Tell this guy to put his hands on

11   the hood.

12   Q.    Did Officer Muziol do that?

13   A.    Yes.  Officer Muziol said, you know, Why don't you

14   come put your hands on the hood so we can talk to you a

15   little bit.  That's when the defendant, he took about two

16   steps towards the hood, and then turned around and started

17   running.

18   Q.    Did you or Officer Muziol make any action prior to

19   the defendant running?

20   A.    Yeah.  It was either one of us, I can't recall which

21   one of us, one of us clicked our door to get out of the car,

22   to step out and talk to the defendant, you know, on the

23   street.  And that's when he started to run.

24   Q.    Do you recall what the defendant was wearing?

25   A.    I believe it was a black hoodie and blue jeans, if I

Rinehart - direct

1    recall correctly.

2                Yes.

3                MR. MARTYNIAK:  If I can have one moment?

4                THE COURT:  Sure.

5    BY MR. MARTYNIAK:

6    Q.    On that map that I have handed you earlier, can you

7    see where the streetlights that you indicated earlier are on

8    that map?

9    A.    I can't tell from looking at the streetlights or the

10   support beams for the fence that goes along the park, it

11   appears to be, there is telephone poles up that block, I

12   believe with lights on them.

13   Q.    If you can't tell, that's fine.

14                After the defendant began to run, which

15   direction did he run?

16   A.    Southbound, towards Sixth Street.

17   Q.    And what happened?  What did you or Officer Muziol do

18   after that?

19   A.    Officer Muziol put the patrol vehicle in reverse,

20   activated the overhead lights, the emergency equipment.  And

21   as he was driving in reverse, I was turned around in the

22   passenger seat looking out the back window to try to

23   maintain sight of him.

24   Q.    Were you able to maintain sight of him?

25   A.    I was.

Rinehart - direct

1    Q.    Were you saying anything?

2    A.    I was actually speaking to our dispatch center on the

3    radio.  And I was advising them that we had a subject

4    fleeing from us on foot and that he appeared to be in

5    possession of a weapon.

6    Q.    Did you ever lose eye contact with the defendant?

7    A.    No.

8    Q.    Or visual contact, I should say?

9    A.    No, I did not.

10   Q.    Can you describe the path of travel that the defendant

11   took as he fled?

12   A.    He ran southbound on Madison Street, crossed over

13   Sixth Street and into the rear parking lot -- after running

14   a short distance on Sixth Street westbound, he went into the

15   rear parking lot behind the William Hicks Anderson Community

16   Center, and attempted to scale a fence in the rear lot

17   there.

18   Q.    What type of fence was this?

19   A.    A chain-link fence.

20   Q.    How high was it?

21   A.    Maybe six foot.

22   Q.    And could you just describe, I suppose, what that

23   fence encompassed?  How was the fence laid out?

24   A.    The fence encompasses, I would call it a courtyard,

25   behind the Williams Hicks Anderson Center.  They have a

Rinehart - direct

1    delivery area back there where they take their deliveries

2    in.   There is a sidewalk that runs up to the back of the

3    building.   Then there is the grass.   That fence encompasses

4    that, about midway down the building off of Madison Street,

5    all the way down the Sixth Street side to the parking lot,

6    and into the rear parking lot, and then back to the building

7    again.   It comes as like a courtyard.

8    Q.    If you were to climb that fence from where the

9    defendant was located at and end up on the other side, would

10   you be in an enclosed area?

11   A.    Yes.

12   Q.    So once the defendant gets to this particular fence,

13   did he attempt to scale it?

14   A.    Yes.

15   Q.    What happens after that?

16   A.    After he attempted to scale the fence, he got maybe

17   two hands up -- both his hands on the fence, and then got

18   back down.   At that point Officer Muziol and I were about

19   parallel to him in the rear lot.   When he went up on the

20   fence, it gave me enough time to get out of the car.   I

21   exited the vehicle, went around the back of the car, at

22   which time the defendant turned around and started running

23   northbound through the back lot.   And that's where I saw

24   what I believed to be the firearm fall.

25            THE COURT:   He ran which way?   I am sorry.

Rinehart - direct

| | |
|---|---|
| 1 | THE WITNESS:  He spun around, Your Honor, and |
| 2 | ran northbound in the rear lot. |
| 3 | BY MR. MARTYNIAK: |
| 4 | Q.    Is that back towards Sixth Street? |
| 5 | A.    Correct.  Back towards Sixth Street. |
| 6 | Q.    You indicated you exited the car? |
| 7 | A.    I did. |
| 8 | Q.    Where on that map was the police vehicle located when |
| 9 | you exited the car? |
| 10 | A.    We were about -- we were right about midway between |
| 11 | Sixth Street and the larger building on the map. |
| 12 | I don't know if you have the map or not, Your |
| 13 | Honor. |
| 14 | THE COURT:  No. |
| 15 | Do you have an extra copy of the map? |
| 16 | MR. MARTYNIAK:  I do, Your Honor.  If I may |
| 17 | approach. |
| 18 | THE COURT:  Sure. |
| 19 | BY MR. MARTYNIAK: |
| 20 | Q.    If you could describe again where the police vehicle |
| 21 | was located when the defendant attempted to scale the fence? |
| 22 | A.    We were approximately, if you look at the larger |
| 23 | building on the map, Your Honor, it says Wilmington on |
| 24 | there, we were approximately midway between Sixth Street and |
| 25 | that larger building in that back lot there where the cars |

Rinehart - direct

1   are parked.

2   Q.    You indicated the defendant then fled north back

3   towards Sixth Street?

4   A.    Correct.

5   Q.    Can you describe your chase of the defendant?

6   A.    Once I exited the patrol vehicle, as soon as I exited

7   the vehicle, the defendant started running.  I was running

8   at an angle towards him.  He started running north.  While

9   he was running, about two steps after he got down off the

10  fence, I saw what I believed to be a firearm fall from his

11  right side.

12              He ran.  I started giving him verbal commands.

13  He continued to run, after what I thought was the firearm

14  fall, he continued to run to the corner of Sixth and that

15  rear lot, where, after my second or third verbal command, he

16  laid down on the ground.

17  Q.    How far from where the gun fell from the defendant did

18  the defendant run before he went to the ground?

19  A.    About five yards.  Five yards is what I report.

20  Q.    Did you then -- what did you do then?

21  A.    Attempted to place him into custody.  He refused to

22  give up his hands right away.  I gave him a stun blow, back

23  of the head.  And my partner and I were able to gain control

24  of his hands after my partner put his knee on the

25  defendant's back.

Rinehart - direct

1    Q.    From what you could tell, was the defendant injured in

2    that encounter?

3    A.    No.

4    Q.    Were you injured?

5    A.    No.

6    Q.    Did you ask the defendant if he wanted to go to the

7    hospital?

8    A.    Yes.  He declined.

9    Q.    Can I assume that the defendant was then taken into

10   custody?

11   A.    Yes.

12   Q.    And did you respond back to the area where you thought

13   you saw a firearm fall from the defendant?

14   A.    Yes, we did.

15   Q.    What did you find?

16   A.    We located a black in color Model 19 Glock

17   semiautomatic handgun.

18   Q.    Could you describe for the Judge where that was

19   located?

20   A.    It was located -- let me refresh my memory, sorry.

21             MS. BRADFORD:  If I may ask what he is using to

22   refresh his recollection.

23             THE WITNESS:  I'm sorry.  I am using my report

24   from that evening.

25             Listed on the sidewalk right down, right about

Rinehart - direct

1    maybe two yards from where the subject, or the defendant had

2    jumped off the fence, it was on the sidewalk in the rear of

3    the William Hicks Anderson Community Center.

4                THE COURT:  Mr. Martyniak, perhaps you can have

5    him mark on the exhibit where he discovered the gun.

6                MR. MARTYNIAK:  Yes, Your Honor.

7    BY MR. MARTYNIAK:

8    Q.   If you could mark where the gun was located, and if

9    you could, also, where the defendant went to the ground at.

10               Could you describe the condition of the firearm?

11   A.   It was, looked, appeared to be in perfect condition,

12   perfect working order.  It contained 12 hollow point

13   nine-millimeter rounds, all of which were in the magazine.

14   None of those were racked into the chamber of the gun.

15               It was free of any debris.  There wasn't any

16   trash in that immediate area.  There wasn't any other items

17   in that immediate area other than the firearm.

18   Q.   Were there any other people in that immediate area?

19   A.   No.  There was no other persons in that area at all.

20   Q.   Were there any other people located in the area during

21   the chase of the defendant?

22   A.   Not that I saw.

23   Q.   Do you recall if any other contraband was located from

24   the defendant?

25   A.   Yes.

Rinehart - direct

1    Q.    What was that?

2    A.    About a gram of crack cocaine.

3    Q.    And can you describe for the Judge how that was

4    located?

5    A.    We were processing the defendant at turnkey, or at the

6    jail cell, whereupon he clearly stated to me that he had

7    approximately a gram of crack cocaine in his pocket.

8    Q.    Are you positive that the firearm fell from the

9    defendant's possession prior to him submitting to your

10   command?

11   A.    I am.

12            MR. MARTYNIAK:  I have no further questions at

13   this point.

14            THE COURT:  Ms. Bradford.

15            MR. MARTYNIAK:  Actually, Your Honor, if I could

16   submit that, the map, as --

17            THE COURT:  I would like Ms. Bradford to see it

18   first, and then I would like to take a look at it.  Why

19   don't you get it from the witness, Mr. Martyniak.

20            Why don't I take a look at it.  We can then give

21   it to Ms. Bradford.  She may want to use it during her

22   examination.

23            Thank you, Officer.

24            Officer, if you could, for the record, indicate

25   where you recovered the gun, use a G.

Rinehart - direct

1          THE WITNESS:  That's what this is, right there,

2     it's about right there.  This is where the defendant laid to

3     the ground.

4          THE COURT:  Describe where the G is on the map

5     verbally.

6          THE WITNESS:  The gun was on the sidewalk, right

7     adjacent to the fence.  If you come down off the fence,

8     there is a very small strip of grass, and there is a

9     sidewalk, and then that sidewalk turns directly into the

10    parking lot.  The gun was actually laying on the sidewalk.

11         THE COURT:  Ms. Bradford?

12         MS. BRADFORD:  Thank you.

13                    CROSS-EXAMINATION

14    BY MS. BRADFORD:

15    Q.    Good morning, Officer Rinehart.

16    A.    Good morning, ma'am.

17    Q.    Officer Rinehart, you used today to refresh your

18    recollection in testifying your police report.  Correct?

19    A.    That's correct.

20    Q.    Is there anything else you used to prepare yourself

21    for your testimony today?

22    A.    No.  Just my police report.

23    Q.    Did you take any handwritten notes at the time of this

24    incident?

25    A.    No, ma'am.

Rinehart - cross

1  Q.    In fact, you referred to a police dispatch that you,

2  yourself, made.  Correct?

3  A.    Yes, just a communications center.

4  Q.    Was that ever obtained or did you ever know if that

5  was --

6  A.    That is in the process of being -- it's very hard,

7  actually, to get a tape of what we say over the radio.  But

8  I am working on getting that.

9  Q.    Very well.

10        Officer, on this day in question, I would say on

11  January 8, 2008, you were on regular patrol.  Correct?

12  A.    Yes.

13  Q.    Routine patrol?

14  A.    Yes.

15  Q.    In fact, your routine patrol leads you to patrol the

16  area of North Madison Street, I guess 600 North Madison

17  Street.  Is that correct?

18  A.    Yes, 600 block of Madison as well as all the

19  surrounding areas.

20  Q.    It's fair to say that, in your police report, as in

21  your testimony today, that you did not get a radio call from

22  any other resident in that area complaining of a person

23  matching Mr. Smith's description.  Correct?

24  A.    No, we did not.

25  Q.    And, in fact, this is a residential area.  Correct?

Rinehart - cross

1   A.    It is.

2   Q.    So there are residents who live in the area who would

3   call you if they had some kind of incident that they wanted

4   you for investigation?

5   A.    Correct.

6   Q.    On this day in question, when you got to the area on

7   routine patrol, you say you encountered Mr. Smith.  Correct?

8   A.    I did.

9   Q.    And he was, in fact, the only person on the street at

10  that time.  Correct?

11  A.    He was the only person that we saw in that area.

12  Q.    And you said based on your, I guess, instructions to

13  make your presence known, you decide to have an encounter

14  with Mr. Smith?

15  A.    Correct.

16  Q.    Upon seeing him.  Correct?

17  A.    Correct.

18  Q.    And not because you saw him doing anything, but

19  basically because you were instructed to make your presence

20  known?

21  A.    Yes.  Our Lieutenant's exact words were to stop and

22  identify people.

23  Q.    Stop and identify people?

24  A.    Find out who they were, find out where they are going,

25  what they're doing outside.

Rinehart - cross

1   Q.    Or at least ask them?

2   A.    Correct.  Ask them.

3   Q.    Once you do that, once you see Mr. Smith, you see him

4   walking -- and you say it's January.  Correct?

5   A.    Yes.

6   Q.    And you made a specific reference to what the weather

7   was.  Is that your estimated guess?  Or did you have

8   something that told you the exact weather at the time?  Or

9   you are guessing that it would be 45 degrees?

10  A.    The 45 degrees, I believe, if I recall correctly, was

11  off of the WeatherChannel.com, weather.com.  I always have

12  that up in the car, just to watch if rain is coming into the

13  area or anything like that.

14  Q.    On this night, at 2:00 in the morning, there was no

15  rain, you noted that on your WeatherChannel.com that it was

16  45 degrees?

17  A.    Correct.  That's where the 45 degrees came from.  As

18  far as the clear skies and calm winds, that was my personal

19  observation.

20          THE COURT:  Not that it matters a great deal,

21  it's early in the morning.  You just said 2:00.  Is it 2:00

22  or 3:00?

23          THE WITNESS:  We stopped him at 3:13.

24          MS. BRADFORD:  I apologize.

25  BY MS. BRADFORD:

Rinehart - cross

1   Q.     3:00.  My mistake.

2          And when you saw Mr. Smith you said he had his

3   hands in his pocket and he was just walking?

4   A.     Correct.

5   Q.     You asked him what his name was first?

6   A.     Actually, my partner asked him if he had any

7   identification.

8   Q.     Your partner didn't ask him what his name was?

9   A.     No.  As far as I know my partner asked him, Do you

10  have any identification?

11  Q.     And at that point -- to which he replied no?

12  A.     Correct.

13  Q.     And actually kept walking.  Correct?

14  A.     Not to my knowledge.  When Officer Muziol asked him,

15  Do you have any identification, he stopped, turned to our

16  car, at least to a 45 to our car, and said no.  And then

17  Officer Muziol said, Where are you heading?  And that's when

18  the conversation --

19  Q.     Let me finish asking you the question on that.  I

20  apologize.

21         Once you asked him if he had identification, he

22  stopped.  Correct?

23  A.     Correct.

24  Q.     How far are you from him at this point?

25  A.     A foot to two foot, because we had to pull in front of

Rinehart - cross

1    the center of the roadway over against the curb.

2    Q.    So you can clearly see him?

3    A.    Correct.

4    Q.    At that point, as you indicated in your police report

5    and as you testified to on direct, you didn't notice

6    anything that would cause you to believe that he had a

7    weapon.  Correct?

8    A.    That is correct.

9    Q.    Now, once he says no, he then continues to walk.

10   Correct?

11   A.    It wasn't a walk.

12   Q.    He didn't -- he took maybe a step?

13   A.    It was a sidestep.  I don't even know how to describe

14   it.  It was a very small kind of, away from our car

15   (indicating).

16   Q.    For description purposes, he pretty much remained in

17   that same area?

18   A.    Yes.

19   Q.    While you were questioning him?

20   A.    Yes.

21            THE COURT:  In your judgment, he had remained

22   stopped?

23            THE WITNESS:  Correct.  In my judgment, he had

24   remained stopped.

25   BY MS. BRADFORD:

Rinehart - cross

1    Q.    The question from your officer then was where are you

2    headed.  Correct?

3    A.    That's correct.

4    Q.    To which he replied, To my girl's house?

5    A.    To my girl's house.

6    Q.    At that point, does he then continue to walk?

7    A.    No.

8    Q.    He stays?

9    A.    Correct.

10    Q.    And he is staying basically because your officer is

11    still questioning him?

12    A.    Bart was still, said, Where's your girl's house or

13    something about, Where are you coming from?  I can't

14    remember what Bart's next words were, because I was paying

15    attention to where his hands were and on our personal safety

16    while Bart was engaged in a conversation with him.

17            THE COURT:  Bart is Officer Muziol?

18            THE WITNESS:  I am sorry.  That is Officer

19    Muziol.  I am sorry, Your Honor.

20    BY MS. BRADFORD:

21    Q.    At that time, Officer Muziol then asked him again

22    where his girl lived, to which -- I don't know if you heard

23    or not, do you know if the defendant replied, On Fifth

24    Street?

25    A.    No.  I didn't hear that.

Rinehart - cross

1    Q.    You didn't hear that?

2    A.    I don't recall that.

3    Q.    Once that encounter is over, where your fellow officer

4    is asking where he is headed and he replies, you then, you,

5    yourself, or your officer then tells him to get over to your

6    vehicle?

7              THE COURT:  When you say your officer, you are

8    talking about Officer Muziol?

9              MS. BRADFORD:  I asked him was it he or Officer

10   Muziol.

11             THE COURT:  You referred to his partner as your

12   officer.  I am not sure what you mean.

13   BY MS. BRADFORD:

14   Q.    Your partner.

15   A.    Officer Muziol --

16             MR. MARTYNIAK:  Your Honor, before he answers, I

17   would object to the form of the question.  I think it was

18   you told him to get over to your vehicle.  I don't believe

19   that was the officer's testimony.

20             THE COURT:  It's cross-examination.  The officer

21   is well able to correct her if necessary.

22             MR. MARTYNIAK:  Yes, Your Honor.

23             MS. BRADFORD:  Thank you.

24             THE WITNESS:  I am sorry.  I am a little

25   confused.

Rinehart - cross

1              Officer Muziol asked him to step over and place

2      his hands on the hood so we could speak with him further.

3      BY MS. BRADFORD:

4      Q.     So you personally heard Officer Muziol tell him to

5      come over to the vehicle?

6      A.     I did.

7      Q.     And place his hands on the top of the vehicle?

8      A.     Correct, on the hood.

9      Q.     On the hood of the vehicle?

10     A.     Correct.

11     Q.     This was all to ascertain identification?

12     A.     To ascertain his identification and conduct further

13     identification checks, to see where he was heading, because

14     his answers to what Officer Muziol was asking and his

15     overall body language for me was enough to have him stopped

16     and put his hands on the hood of the car.

17     Q.     So it was to obtain his identification to see who he

18     was?

19     A.     Correct.

20     Q.     And at that point, you say the defendant begins to

21     walk towards the vehicle?

22     A.     He took two steps towards the car.

23     Q.     And as he is doing that, you are exiting your car?  Or

24     are you already out of your vehicle?

25     A.     We are in our vehicle until he takes his first step to

Rinehart - cross

```
1    the hood.  When he takes his first step to the hood, it was

2    either one of us or both of us simultaneously, opening

3    our -- pulling the latch on the inside of the door to get

4    out of the car.

5              Once that clicking noise, and my door kicked

6    maybe a quarter of the way opened, the defendant turned and

7    began running.

8    Q.   You are in your full uniform at this point.  Correct?

9    A.   Yes.

10   Q.   With guns on your holsters?

11   A.   Correct.

12   Q.   Once he begins running, he runs, I believe you

13   indicated on your map, which is Government Exhibit 1,

14   southbound on Sixth Street?

15   A.   Correct.

16   Q.   And you take a turn, would that be westbound -- I am

17   sorry, southbound on Madison Street.  Would that be

18   westbound on Sixth Street?

19   A.   Yes.

20   Q.   Now, once he gets there, your partner has to drive his

21   vehicle in reverse?

22   A.   Correct.

23   Q.   And you are saying you are looking through your back

24   window?

25   A.   I am turned like this in the car (indicating).
```

Rinehart - cross

1    Q.    Indicating for the record body facing frontward, head

2    turned towards the back.

3    A.    I am setting just like this in the car.  I got my hand

4    resting about against the dash, and I'm holding myself like

5    this, looking out the back window of the vehicle, observing

6    him run south on Madison.  And as we were catching up to him

7    I was following him up to the car --

8    Q.    Officer, I am sorry.  I just wanted to know that

9    particular point.  You said you were looking out the back of

10   your vehicle?

11   A.    Correct.

12   Q.    Once he runs, you and your partner have to get back

13   into the vehicle.  Correct?

14   A.    No.  We never got out of the car.

15   Q.    How long of a time period would you say it took you to

16   follow and chase Mr. Smith once he started to run?

17   A.    We were parallel with him by the time he got to the

18   corner of Sixth and Madison.

19   Q.    And when you were parallel with him, you say you are

20   on your dispatch radio and you said to your, I guess, fellow

21   officers that you had -- you were chasing a suspect.

22   Correct?

23   A.    Yes.  When we got parallel to him, Officer Muziol

24   turned the vehicle, if this is the defendant, Officer Muziol

25   turned the vehicle up Sixth Street like this so that now the

Rinehart - cross

1    front of our vehicle was facing the defendant as he crossed

2    Sixth Street and began running westbound on Sixth.  So now

3    we are looking at him out our front windshield.

4    Q.    Okay.  Once you said that you radioed to your

5    dispatch --

6    A.    That's correct.

7    Q.    -- that you were chasing a suspect.  Correct?

8    A.    Yes.

9    Q.    Now, you said you used your police report to refresh

10   your recollection?

11   A.    Correct.

12   Q.    Did you notice or did you not notice anywhere in this

13   police report that it has the particular part where you

14   radioed to dispatch the person you are chasing and your

15   reasons why?

16   A.    Let me check.

17            (Pause.)

18            I don't see it in here.

19   Q.    Did you write that on any contemporaneous notes that

20   you made this call and the reasons why?

21   A.    No.

22   Q.    This is from your memory of January 8th?

23   A.    It is.

24   Q.    Of 2008?

25   A.    It is.

Rinehart - cross

1   Q.     Since that date, how many arrests have you made?

2   A.     I don't know, not offhand.  I couldn't tell you

3   offhand the exact number.

4   Q.     Hundreds?

5   A.     No, not hundreds.  Maybe 25.

6   Q.     Maybe 25.  All right.  And how many times would you

7   have radioed to dispatch in those 25 arrests, would you

8   know?

9   A.     Between my partner and I, maybe ten or 15 times?

10  That's just an approximate amount.

11  Q.     That's okay.

12  A.     I never tallied it up.

13  Q.     Once you get, I guess, parallel with Mr. Smith, you

14  are now, your vehicle would be entering into the parking lot

15  behind the rec center.  Correct?

16  A.     Correct.

17  Q.     I am calling the rec center that building in which you

18  said the fence encompasses?

19  A.     Yes.  The William Hicks Anderson Community Center.

20  Q.     When you are in that parking lot, you say Mr. Smith

21  then tries to scale that exact fence?

22  A.     Correct.

23  Q.     And that fence is about six feet high?

24  A.     Approximately six feet, yes.

25  Q.     And you see him -- how far away from him are you at

Rinehart - cross

1    this time?

2    A.    Where is the map?

3              THE COURT:  You can use mine.

4    BY MS. BRADFORD:

5    Q.    Just give me an approximation.

6    A.    It's approximately the sidewalk, and then a car's

7    length, because there were a couple of parked cars further

8    down.  We hadn't turned into the parking area -- there is

9    parking spots, and then there is a driveway, then there is

10   parking spots on the other side of that rear lot.  We hadn't

11   turned off of that driveway into like a parking spot.

12   Officer Muziol was still in the driveway area of the parking

13   lot, in case the subject continued to run southbound.

14   Q.    Would you say about three feet, five feet?

15   A.    I'd say more like ten.

16   Q.    You were about ten feet away?

17   A.    Ten feet.

18   Q.    At the time that you are ten feet away from him, you

19   say you see him scaling the fence using both hands?

20   A.    Correct.

21   Q.    And you don't see anything in his hands?

22   A.    No, not at the time.

23   Q.    In fact, he is not touching any part of his body?  He

24   is actually using both hands to hang onto the fence?

25   A.    That's correct.

Rinehart - cross

1    Q.    Now, Mr. Martyniak asked you, if you were to climb

2    into the fence, they would be in an enclosed area.  Correct?

3    A.    Yeah.

4    Q.    And looking at the map, Government's Exhibit 1, you

5    would agree with me that this parking lot is an open-ended

6    area.  Correct?

7    A.    The parking lot is an open area, yes.

8    Q.    And there is actually a park right across the street.

9    Correct?

10   A.    Correct.

11   Q.    And there is streets and sidewalks and all kinds of

12   different things.  Correct?

13   A.    Correct.

14   Q.    In fact, there are houses where there are small

15   alleyways off the parking lot area.  Correct?

16   A.    Yes.  I don't know about alleyways, but those houses

17   face out onto the 500 block of Monroe.

18   Q.    But there are small alleyways in between each house.

19   Isn't that correct?  This is your patrol area.  Correct?

20   A.    I believe so.  I believe that they have alleyways that

21   run from the front to the back in order for them to get

22   their trash dumpsters in and out.

23   Q.    Once he attempts to scale that fence, you say that is

24   a failed attempt, he kind of just falls back down?

25   A.    Correct.

Rinehart - cross

1    Q.    And at this time you don't see anything in his hands

2    or him clutching onto his waistband or anything?

3    A.    Not at that time.

4    Q.    And you say he runs about maybe two feet.  Correct?

5    A.    Yes.

6    Q.    And you say you see a dark object fall?

7    A.    Correct.

8    Q.    Where, in fact, did that dark object fall from?

9    A.    It appeared to fall from his right, his right side.

10   The best that I could get, like his right pants area.

11            I couldn't tell you exactly where it fell from

12   his body.  But it definitely fell from his right side pants

13   area.  It wasn't from like up around his collar or anything.

14   It was from the right side pants area.

15   Q.    Did you see it come like down from out of his pant

16   leg?  Could you describe exactly where you saw it come out

17   of?

18   A.    I just saw it fall from his right side pant leg area.

19   Q.    Which means towards the ankle or towards the waist?

20   A.    I'd say more towards like the waist area.

21   Q.    Like it just kind of dropped out of the waist area?

22   A.    Correct.

23   Q.    At this point your best description of that would be a

24   dark object?

25   A.    Dark object.

Rinehart - cross

1    Q.    You say you exit your vehicle at this time.  Correct?

2    A.    I did.

3    Q.    And you maybe chase him about a yard or two, or five

4    yards?

5    A.    About five yards.  I was -- let me back up for a

6    second, if I can.  I just picked up on something.  I was out

7    of the car already when I saw this item fall.  When he came

8    down off the fence, I exited the car.  When I was coming at

9    an angle to him on foot is when I saw the item fall.

10              THE COURT:  I wanted to clear that up, because I

11   thought I heard you say on direct that you saw the item fall

12   when he came off the fence.  When did you see the item fall?

13              THE WITNESS:  When he comes down off the fence,

14   he lands, turns.  I start exiting the car.  As I exit the

15   car, I started running at an angle.  He is running up the

16   rear parking lot.  I am running from the parking lot into

17   the sidewalk.  About two feet after he gets down off the

18   fence and he started running is when I see the item fall.

19   Then we continue to run a short distance.  He drops to the

20   ground.

21   BY MS. BRADFORD:

22   Q.    You say fall.  You didn't see him physically take his

23   hands and throw anything?

24   A.    No.

25   Q.    Or discard anything?

Rinehart - cross

1    A.    No, I didn't.

2    Q.    Now, you said, after we have gotten through where you

3    saw it fall, you say you chased him about another five

4    yards?

5    A.    Correct.

6    Q.    And he willfully submitted.  Correct?

7    A.    Yes.

8    Q.    By laying on the ground?

9    A.    Correct.

10   Q.    Once he lays on the ground, you then get on top of

11   him?

12   A.    I grab his --

13   Q.    Are you using your notes to refresh your recollection?

14   A.    I am.  I am using my notes to refresh my recollection.

15             Yes.  I attempted to place him into custody.  I

16   got down, I think I had one knee up on his back and I was

17   trying to get hold of his right arm.

18   Q.    This was after he willfully submitted.  Correct?

19   A.    Correct.

20   Q.    You said once you are on top of him, you say you are

21   struggling with him to submit further?

22   A.    His left arm was under his body.  I kept saying, bring

23   out your arms, bring out your arms.  He didn't bring out his

24   arms.  Stun blow.  Officer Muziol came over, put his knee

25   down onto his back.

Rinehart - cross

1    Q.    I want to make sure.  I am going -- we are going to go

2    through it.  I wanted to go sequentially.

3              Once you are struggling with him to submit

4    further, did you notice that he urinated on himself?

5    A.    No.

6    Q.    You never noticed that?

7    A.    No.

8    Q.    Did you ever make reference that you weren't going to

9    go into his pockets because he was all wet?

10   A.    Not that I recall.

11   Q.    At the station did you ever make a reference of him

12   urinating on himself at the time that he was on the ground?

13   A.    No.

14   Q.    Not that you recall?

15   A.    Not that I recall.

16   Q.    You said you had to deliver a stun blow.  Can you

17   describe that?

18   A.    It is a technique that we are taught in the academy to

19   loosen -- it's the palm of your hand, strike a muscle in the

20   body, it's supposed to, like, they taught us in the academy,

21   like the back of the head, strike the back of the head, it

22   stuns, they lose -- it kind of knocks the wind out of you

23   for a second.  That way you are able to gain control.

24   Q.    Indicating for the record you used your palm of the,

25   the palm of your hand?

1   A.    Yes.

2   Q.    And pushed --

3            THE COURT:   That would be the heel.

4   BY MS. BRADFORD:

5   Q.    The heel of your hand?

6   A.    Yes.

7   Q.    And made contact with the back of Mr. Smith's head?

8   A.    Correct.

9   Q.    And at this time your partner is on top of him, also?

10  A.    My partner was on top.  My partner put his knee on the

11  center of the defendant's back.

12  Q.    Now, once you are able to get him restrained --

13  actually, how long does that take?  Less than a minute?

14  A.    Maybe a minute?

15  Q.    Maybe a minute?

16  A.    If that.

17  Q.    Once you are able to get him restrained, you say you

18  lift him up.  Correct?

19  A.    Correct.

20  Q.    And you walk him to your patrol vehicle?

21  A.    Correct.

22  Q.    Before you put him in your patrol vehicle, do you pat

23  him down or search him for any further weapons?

24  A.    I believe Officer Muziol did.  I don't recall patting

25  him down before I put him in the car.

Rinehart - cross

1   Q.    Once that was done, you didn't feel or find the bag of

2   crack cocaine?

3   A.    Not at that time.

4   Q.    And that would have been located later in his pants

5   pocket?

6   A.    Correct.

7   Q.    And you put him in your vehicle.  You take him to the

8   station?

9   A.    Correct.

10  Q.    How long is it that he is in the station until you say

11  that he voluntarily tells you that he has crack cocaine?

12  A.    Five minutes, maybe.

13  Q.    He is in the station.  He is in the cell.  Correct?

14  A.    No.  He is not in the cell.  We have to process them.

15  We have to go through all their pants pockets.  We take

16  their shoelaces, their belt if they wear one, any hats,

17  items like that.

18  Q.    Can I ask you a question on that.  Once he gets into

19  the station, you take him to be processed, you describe

20  processing as searching him, going through his pants

21  pockets, taking any of his items, I guess to write an

22  inventory of what he has?

23  A.    Correct.

24  Q.    And in doing that, you did not find the crack cocaine

25  in his pockets?

Rinehart - cross

1  A.    No.  Before I started that process, I have something I

2  do to everybody I bring in, I ask them if there is anything

3  else they need to tell me about.

4  Q.    Upon your asking him if there is anything else that he

5  needs to tell you about, that's when he answers, I have

6  crack cocaine in my pocket?

7  A.    Yes, I got a couple bags of crack in my pocket.

8  Q.    This is while he is in the station, I believe he is

9  handcuffed?

10  A.    Correct.

11  Q.    Did you yourself refuse to go into his pockets?

12  A.    I don't recall.  I bring so many people into the back,

13  I can't recall if I refused to go in his pockets or not.

14  Q.    Now, you say he takes the crack out of his pockets and

15  gives it to you?

16  A.    I don't remember.

17  Q.    You can't remember.  After all of that happens, you

18  then attempt to Mirandize him and ask him to make a

19  statement.  Correct?

20  A.    Correct.

21  Q.    To which he replies he does not want to?

22  A.    Correct.

23          MS. BRADFORD:  No further questions, Your Honor.

24          THE COURT:  Any redirect?

25          MR. MARTYNIAK:  Briefly, Your Honor.

Rinehart - redirect

1                      **REDIRECT EXAMINATION**

2      BY MR. MARTYNIAK:

3      Q.    How would you describe the encounter between Officer

4      Muziol and the defendant prior to Officer Muziol asking the

5      defendant to place his hands on the hood of the vehicle?

6                  MS. BRADFORD:  Objection, Your Honor.

7                  THE COURT:  It is vague, how would you describe

8      the encounter.  You can ask a specific question.  I am not

9      sure what point this goes to relative to her

10     cross-examination.  But go ahead.

11     BY MR. MARTYNIAK:

12     Q.    Would describe the encounter as consensual?

13                 MS. BRADFORD:  I am going to object, Your Honor.

14                 THE COURT:  Sustained.

15     BY MR. MARTYNIAK:

16     Q.    Did you notice anything in particular about the

17     defendant's body language while he was running prior to his

18     attempting to scale the fence?

19                 MS. BRADFORD:  Objection, Your Honor.

20                 THE COURT:  Sustained.

21                 MR. MARTYNIAK:  I don't understand why it is an

22     objectionable question.

23                 THE COURT:  You went over this on direct exam.

24     I don't need to hear it again.  I heard the officer's

25     testimony.

Rinehart - redirect

1          MR. MARTYNIAK:  Very well, Your Honor.  I have

2   no further questions.

3          THE COURT:  Officer, thank you.  You are

4   excused.

5          (Witness excused.)

6          THE COURT:  Do you have another witness?

7          MR. MARTYNIAK:  No, Your Honor.

8          THE COURT:  Fine.  The government rests on the

9   motion?

10          MR. MARTYNIAK:  I would ask the map be admitted.

11          THE COURT:  Any objection?

12          MS. BRADFORD:  No objection.

13          THE COURT:  Government 1 is admitted.

14          (Government Exhibit No. 1 received in evidence.)

15          MS. BRADFORD:  The defense rests, Your Honor.

16          THE COURT:  Okay, counsel.  Interesting fact

17   pattern.  I want to give the government and the defense an

18   opportunity to brief the issues.  You can advise your

19   partner he can come back in, Officer.

20          What I would like to get right now from you is

21   some thought as to the timing of your submissions.

22          MS. BRADFORD:  Your Honor, we are at the Court's

23   schedule.

24          THE COURT:  Hold on just a second.

25          My law clerk is reminding me we have a trial

1    date coming up, I believe, in this case.

2              THE COURT:  July 9th.  We will need to move the

3    briefing along, so that, if necessary, I can convene

4    argument and/or issue a ruling, hear argument and then issue

5    a ruling, but in any event, issue a ruling of some type.

6    So, counsel, tell me what you want to propose.

7              MS. BRADFORD:  Your Honor, I think we would need

8    at least 30 days.

9              THE COURT:  To complete the process?

10             MS. BRADFORD:  Yes, Your Honor.

11             THE COURT:  That would put us at the end of

12   June.  We have a July 9 trial date.  I don't want to move

13   the trial date.  I am sure Mr. Smith does not want it moved,

14   either.

15             This is my assumption.  I am not implying

16   anything.  I suspect that much is going to turn on the

17   resolution of this motion.

18             MS. BRADFORD:  Absolutely, Your Honor.

19             THE COURT:  Ms. Bradford and Mr. Martyniak, do

20   you have any trials looming in the next two weeks?

21             MS. BRADFORD:  I do not.

22             MR. MARTYNIAK:  I have plenty of trials looming,

23   Your Honor.  If I may inquire, I did not bring my calendar,

24   as to the scheduling conference date.

25             THE COURT:  I don't know.  You mean the pretrial

1    conference date?

2            MR. MARTYNIAK:  Yes, Your Honor.  I am sorry.

3            THE COURT:  While we are doing that, I would

4    offer this observation.  It seems to me that both parties'

5    attention is going to be drawn to the Hodari D case on some

6    level.  I think that's an issue that has to be, that case,

7    that holding, the holding in it, Justice Scalia's holding is

8    one that needs to be reckoned with.

9            I would suggest that the facts of this case may

10   present the question that was not answered in Hodari D.  The

11   specific question, I will read from the opinion, the Justice

12   wrote that, The narrow question before us is whether, with

13   respect to a show of authority as with respect to

14   application of physical force, a seizure occurs even though

15   the subject does not yield.  We hold that it does not.

16           Does the government have a position as to

17   whether a seizure has occurred in this case?

18           MR. MARTYNIAK:  The government's position would

19   be that a seizure has not occurred until he submits to the

20   authority, in this particular case when he voluntarily falls

21   to the ground, which is after the weapon falls from his

22   person.

23           THE COURT:  That is sort of what I would have

24   anticipated.  You may have a chance to argue this further.

25   Did he not submit to authority when summoned by Officer

1    Rinehart?  Actually, I believe it was Officer Muziol who

2    summoned him.

3           MR. MARTYNIAK:  I suppose, with the

4    understanding that further briefing is allowed, the

5    government's argument would be that a brief momentary stop

6    followed by flight --

7           THE COURT:  That is your characterization of it.

8    The Officer hasn't characterized it.  You didn't ask him to

9    characterize it.  Nobody asked him to characterize it.  He

10   described what happened.  He described -- we don't know over

11   what period of time it happened.  It took at least more than

12   seconds for this questioning to occur, I suspect.

13          MR. MARTYNIAK:  Your Honor, the government would

14   argue that there is no submission to any show of authority

15   prior to the question, could you place your hands on the

16   hood?  An officer is free to engage individuals in any sort

17   of conversation --

18          THE COURT:  Terry is still good law in this

19   country, Mr. Martyniak.

20          MR. MARTYNIAK:  Understood, Your Honor.

21          THE COURT:  Do you maintain that prior to the

22   submission, what I am going to characterize as the

23   submission to authority, that there was objective indicia of

24   criminal activity afoot at the time that Mr. Smith was

25   initially stopped?  It seems to me that, if I may go on,

1    that Officer Rinehart was quite candid in his testimony that

2    he didn't see any criminal activity afoot.  He was

3    responding to a directive from his Lieutenant.

4              MR. MARTYNIAK:  I am not sure that the officer's

5    subjective intent is --

6              THE COURT:  I didn't ask you anything about his

7    subjective intent.  I asked you what observations Officer

8    Rinehart testified to that the government can reasonably

9    assert amounted to a Terry basis for a stop in this case.

10             MR. MARTYNIAK:  The government would argue that

11   there is no Terry-based stop.

12             THE COURT:  That is my point exactly.  But,

13   again, I am going to characterize, at least for the purposes

14   of our conversation right now, and leave myself the

15   opportunity to decide otherwise, because I am asking for

16   briefing, that there was a submission to authority.  I think

17   the officer's testimony is clear that there was a submission

18   to authority.

19             How the Supreme Court or the Third Circuit or I

20   may ultimately decide that question, that I think has not

21   been answered by Hodari D, perhaps, is an open question.

22             MR. MARTYNIAK:  If I may ask, at what point does

23   Your Honor feel that the submission to authority occurred?

24             THE COURT:  I don't know.  I am going to keep an

25   open mind on that issue.  You should want me to have an open

1   mind on that, because it would be very easy for me to

2   conclude sitting here today were I to just shoot from the

3   hip that the submission occurred at the time that Officer

4   Muziol said, Can I talk to you?  Can we talk to you?  He is

5   in uniform, in a marked car, two officers.  And the

6   defendant says -- he stops.  Not only does he stop, at some

7   point he turns towards the officer's patrol vehicle,

8   subsequent to further questioning.

9          He doesn't have any identification, but he has

10  stopped.  And when he is told to put his hands on the hood,

11  he moves towards the car.  Now, he does not actually submit

12  to the command to put your hands on the car because the door

13  is open at that time.  Then he moves, he runs.

14         So I think it can be reasonably asserted, in any

15  event, I am sure it is going to be argued, that a submission

16  to authority occurred prior to that time and that that takes

17  this case out of Hodari D.  I don't know.  I haven't decided

18  the issue.

19              MR. MARTYNIAK:  Understood.

20              THE COURT:  I am trying to give counsel some

21  insight into the Court's thinking, at least as to what you

22  want to address in this case.

23         The other issue, I am curious -- Ms. Bradford,

24  did you want to weigh in on this at all?

25              MS. BRADFORD:  Your Honor, I believe, the

1    defendant's position would be exactly that, that he

2    submitted to authority.  We would start at the time that he

3    stopped and answered the line of questions.

4              THE COURT:  These are questions -- this is a

5    question that at least has to be briefed.  It seems to me,

6    there is another question.  That is, Mr. Martyniak, what is

7    the government's position with regard to the contraband

8    itself, the gun?  Was it lost?  Or abandoned?  Those are

9    terms of art.  You might want to, both parties might want

10   to -- what's the case?  I happen to have it here.  Fulani.

11   It is an '04 Third Circuit opinion, I believe it's

12   precedential.  It's cited at 368 F.3d 351.

13             Just some preliminary thoughts that you might

14   want to have in addressing your briefing on this case.  It

15   seems to me the answer to that question may be dispositive

16   as well, under the circumstances.  It seems to me very

17   clear, the officer again was very forthright, he didn't see

18   the gun tossed.  It fell.  He said he thought it fell from

19   the waistband.  Okay.  Well, it fell.  Regardless of whether

20   it slid down the pants leg through a hole in the pocket or

21   from the waistband.  It fell.  It was not, perhaps,

22   abandoned.  I don't know.  It may not make a difference.

23   Again, I don't' know.  I am going to be interested in the

24   research that counsel do on the issue and hearing from,

25   perhaps hearing your advocacy during oral argument.

1                  So we need to be on a rather aggressive briefing

2     schedule.

3                  The trial starts the 14th.  The pretrial

4     conference is the 10th.

5                  So the government bears the burden here, it

6     seems to me.  Have you discussed who wants to go first?

7                  MS. BRADFORD:  Your Honor, if the government

8     could go first because they have the burden, we will

9     respond.  That's fine.

10                 THE COURT:  I think that's the way it should be.

11    When can you get your first submission in?

12                 MR. MARTYNIAK:  The government would ask for

13    until May 14th if possible, Your Honor.

14                 THE COURT:  You mean June 14th.

15                 MR. MARTYNIAK:  June 14th, I am sorry.

16                 THE COURT:  That is a Saturday.

17                 MR. MARTYNIAK:  June 13 would be good.

18                 THE COURT:  And you would like two weeks.

19                 MS. BRADFORD:  If we may, Your Honor.

20                 THE COURT:  All right.  You are pressing me.

21    June 27th is what day of the week?

22                 MS. WALKER:  It is a Friday.

23                 THE COURT:  We are getting quickly into the 4th

24    of July.

25                 I will give the government an opportunity, if it

1    cares to, to file a reply by Monday, close of business

2    Monday, the 30th.  It looks like you are going to be working

3    over the weekend, Mr. Martyniak.  Thankfully, it won't be

4    the 4th.

5                All right.  Anything else, counsel?

6                MR. MARTYNIAK:  Nothing from the government.

7                MS. BRADFORD:  No, Your Honor.

8                THE COURT:  The witness made some markings on

9    the exhibit.  Did counsel want a copy of the original?

10               MS. BRADFORD:  I have it.

11               THE COURT:  Ms. Walker will make each side a

12   copy so that you have it.

13               Okay.  We are in recess.

14               (Court recessed at 11:19 a.m.)

15                          -  -  -

16   MICHAEL RINEHART

17                    Direct  ------------------  Page 2

18                    Cross  ------------------  Page 20

19                    Redirect  ----------------  Page 42

20

21   Government 1    Map  ---------------------  Page 43

22

23   Reporter:  Kevin Maurer

24

25