IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal Action No. 08-08-GMS |
| Plaintiff, : | |
| v. : | |
| : | |
| THOMAS J. SMITH, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S POST-HEARING RESPONSE
TO DEFENDANT'S MOTION TO SUPPRESS**

The United States, by and through attorneys Colm F. Connolly, United States Attorney for the District of Delaware, and Shawn E. Martyniak, Special Assistant United States Attorney for the District of Delaware, for the reasons set forth below, respectfully requests that the Defendant's *Motion to Suppress Physical Evidence and Statements* be denied.

### I. INTRODUCTION.

On January 22, 2008, the Grand Jury returned a two count indictment charging the defendant with: 1) being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and 2) possession of a controlled substance, in violation of 21 U.S.C. § 844(a).

On March 14, 2008, the defendant filed a *Motion to Suppress Physical Evidence and Statements*. The defendant contends that the officers violated his Fourth Amendment protections by stopping him without reasonable suspicion. On May 29, 2008, this Court conducted an evidentiary hearing to hear testimony related to the stop and arrest of the defendant. In short, the record does not support the defendant's allegations and the Government respectfully aks this Court to deny his motion.

## II. PROPOSED FINDINGS OF FACT.

On January 8, 2008, at approximately 3:00 a.m., Officers Muziol and Rinehart were traveling northbound on Madison Street between Sixth and Seventh Streets in Wilmington, Delaware when they came in contact with the defendant. (T. 8, 9). Officers Muziol and Rinehart were conducting routine high-visibility patrols in their assigned district due to recent criminal activity in the area. (T. 8, 21). The Officers were familiar with the area and knew it as a high crime area with violent crimes occurring at all hours of the day and night. (T. 5). The Officers were in full uniform, driving a fully marked patrol vehicle. (T. 4-5).

When the Officers first saw the defendant, he was walking southbound on Madison Street from Seventh Street towards Sixth Street. (T. 8). The defendant was the only person on the street at that time of night. (T. 22). As the Officers were in a vehicle in a northbound direction and the defendant was on the sidewalk walking southbound, the defendant was located on the driver's side of the police cruiser. Officer Muziol, the driver, first contacted the defendant by asking, "Can I talk to you for a second?" (T. 7, 9).

Officer Muziol then asked the defendant if he had any identification. (T. 9). Officer Muziol did not give an order commanding the defendant to stop. In response to the Officer's questions, the defendant turned towards the police cruiser. (T. 9). The defendant stood at a at a forty-five degree angle to the vehicle and said that he did not have any identification. (T. 8, 9, 24). The defendant then took what appeared to be some sort of sidestep away from the Officer's vehicle. (T. 25).

Officer Muziol asked the defendant where he was headed. (T. 9). The defendant replied that he was heading "to his girl's house." Officer Muziol then asked, "Where is your girl's

2

house?" (T. 10). The defendant replied, "I am heading to my girl's house." (T. 10). Officer Muziol asked the defendant several times where the location of his "girl's house" was and each time the defendant replied that he was heading to his girl's house. (T. 10).

During this brief encounter, Officer Rinehart observed the defendant had his hands in his pockets. (T. 9). While Officer Muziol was conversing with the defendant, Officer Rinehart noted that the defendant would not turn his right side towards the Officers. (T. 10). Officer Rinehart noticed that even when the defendant pointed his hand in a southerly direction, indicating his direction of travel, he used his left hand and pointed across his body. (T. 11). When the defendant lowered his left hand it was shaking. (T. 11). At that point, Officer Rinehart was suspicious of the defendant and suggested Officer Muziol that they should ask the defendant place his hands on the hood of the vehicle. (T. 10).

Officer Muziol then asked the defendant to place his hands on the hood of the vehicle, saying, in particular, "Why don't you put your hands on the hood, so we can talk to you a little bit." (T. 10, 11, 28). The defendant responded by taking two small steps toward the police vehicle. (T. 11). After the first step, one or both of the Officers attempted to exit the vehicle. (T. 29). When the officer pulled the door handle to exit the vehicle and the door "clicked", the defendant immediately ran southbound on Madison Street. (T. 11).

With both Officers still in the police cruiser, Officer Muziol put the vehicle in reverse and followed the defendant (T. 12). Officer Rinehart was looking out the rear window maintaining sight of the defendant. (T. 12). Officer Rinehart was speaking to the dispatch center advising them of the situation. (T. 13).

The defendant fled southbound on Madison Street and turned west onto Sixth Street. (T.

13). The defendant ran a short time on Sixth Street before turning into the rear parking lot of the William Hicks Anderson Community Center. (T. 13). The defendant then attempted to scale a chain-link fence in the rear lot of the center. (T. 13). By the time the defendant attempted to scale the fence at the community center, Officer Muziol had positioned the police cruiser into the rear lot of the Center and approximately parallel to the defendant (T. 14). The defendant's attempt to scale the fence allowed Officer Rinehart to exit the vehicle and head toward the defendant. (T. 14). The defendant then let go of the fence and started running northbound through the parking lot. (T. 14).

By the time Officer Rinehart exited the vehicle, the defendant had started running towards Sixth Street. (T. 15, 16). Officer Rinehart ran towards the defendant at an angle. (T. 16). The defendant ran approximately two steps from the fence when Officer Rinehart saw what he believed to be a firearm fall from the defendant's right side. (T. 16). The firearm fell from the waist-area of the defendant's right side. (T. 35).

Officer Rinehart then began giving the defendant verbal commands to stop (T. 16). After two or three verbal commands to stop, the defendant went to the ground and laid face down. (T. 16). Officer Rinehart attempted to place the defendant into custody, but the defendant refused to remove his hands from under his body. (T. 16). Officer Rinehart administered two stun blows to the back of the defendant's head. (T. 16). Officer Muziol was able to exit the vehicle and place his knee in the defendant's back. (T. 16). This allowed the Officers to take the defendant into custody. (T. 17). The defendant refused any hospital treatment. (T. 17).

After taking the defendant into custody, the officers responded to the location where Officer Rinehart saw the firearm fall from the defendant. (T. 17). The area was approximately

4

five yards back from the location the defendant was taken into custody and approximately two yards from where the defendant jumped off of the fence. (T. 16, 18). The Officers discovered a Glock, Model 19, semi-automatic handgun. (T. 17). The firearm was in perfect condition and in working order. (T. 18). The firearm contained twelve hollow-point, nine-millimeter rounds. (T. 18). Aside from the Officers and the defendant, there were no other people in the area. (T. 18). There was also no trash or other debris in the area where the firearm was discovered. (T. 18).

The defendant was then taken to the Wilmington Police Station for processing. (T. 19). Officer Rinehart asked the defendant if there was anything that he needed to tell the Officer about. (T. 41). The defendant stated that he had a couple of bags of crack-cocaine in his pocket. (T. 41).

### III. LEGAL ARGUMENT.

#### A. Initial Interaction with Police was Consensual in Nature.

Officers Muziol and Rinehart were traveling in their police cruiser first when they first encountered the defendant on the sidewalk. The Officers remained in the vehicle during the encounter. While the Officers were in full uniform and in a fully marked patrol vehicle, the Officers did not activate the emergency equipment nor did they display their firearms during the questioning of the defendant. Officer Muziol asked the defendant, "Can I talk to your for a second?" Officer Muziol then asked the defendant if he had any identification on him. Despite the defendant's consent to the Officer's questioning, the defendant was not "detained" by the Officers.

The Supreme Court has recognized three distinct types of police-citizen interactions: (1) arrest, which must be supported by probable cause, *see Brown v. Illinois*, 422 U.S. 590 (1975);

(2) brief investigatory stops, which must be supported by reasonable articulable suspicion, *see Terry v. Ohio*, 392 U.S. 1 (1968); and (3) brief encounters between police and citizens, which require no objective justification, *see Florida v. Bostick*, 501 U.S. 429 (1991).

In *Terry v. Ohio*, Justice O'Connor wrote, "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968). The Supreme Court has ruled that police officers are allowed to ask questions of anyone without having any evidence creating suspicion. *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

The Third Circuit has recognized that no seizure occurs when an officer approaches an individual in a public place, identifies himself as a law enforcement agent, and asks questions. *United States v. Lockett*, 406 F. 3d 207, 211 (3d Cir. 2005). Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions and ask for identification, provided they do not induce cooperation by coercive means. *Id.* These types of encounters fall within the third type of police-citizen interaction that require no objective justification.

A person has been seized, within the meaning of the Fourth Amendment, only if a reasonable person would have believed he is not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "As long as the person to whom the questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification."

*Id.*[1]

In certain circumstances, not pertinent here, police interaction with individuals can amount to a seizure.[2] In *Mendenhall*, the Court summarized some examples of circumstances that might indicate a seizure: (1) the threatening presence of several police officers; (2) the display of a weapon by the officer; (3) some physical touching of the person; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Mendenhall*, 446 U.S. at 555. "While some factors have been listed, it is clear that this list of factors is not exhaustive and no single factor is dispositive in any case." *Bostick*, 501 U.S. at 439.

---

[1]*See United States v. Drayton*, 536 U.S. 194, 200 (2002)(no Fourth Amendment violation when officers question willing individuals in the street); *United States v. Smith*, 423 F. 3d 25, 26-27 (1st. Cir. 2005)(no seizure when police, in full uniform with their firearms holstered, exit their fully marked police vehicle, approach an individual sitting on a wall, ask for name or identification, and do not touch the suspect); *United States v. Henderson*, 123 F.Appx. 459 (3d Cir. 2005)(not precedential) (no seizure when uniformed officer exited his fully marked patrol vehicle with his hand on his revolver, approached suspect, asked for identification, and asked to pat the suspect down for weapons); *United States v. Williams*, 365 F.3d 399, 406 (5th Cir. 2004) (no 4th Amendment seizure when police officers approached traveler outside of bus, asked to talk in another public area of terminal and the person agreed); *United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004) (no 4th Amendment seizure when officer approached a man, asked man his name, what he was doing in the area, and asked for identification because police questioning of this sort is generally consensual and unlikely to result in 4th Amendment violation); *United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003) (no 4th Amendment seizure when police approached and attempted to speak to person on the street).

[2]*See Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (per curium) (seizure when police entered 17 year old's bedroom, with consent of father, at 3 a.m., suspect was awoken, handcuffed, led shoeless in underclothes, driven past the location where victim's body was located, and brought to police headquarters for questioning); *Illinois v. McArthur*, 531 U.S. 326, 331-33 (2001) (seizure when police refused to allow defendant to enter residence without police escort for two hours); *Johnson v. Campbell*, 332 F.3d 199, 206 n. 6 (3d Cir. 2003) (seizure when officer told suspect he was being detained and repeatedly asked him to roll down his window and provide identification despite refusals by suspect).

Mere questioning by a police officer, however, does not amount to a Fourth Amendment seizure of an individual. "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.[3] *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 216 (1984). Although a person may regret staying to answer an officer's questions such regret does not transform an otherwise consensual encounter into an unconstitutional seizure. *Mendenhall*, 446 U.S. at 556. Also not considered, is the subjective intent of the officer, unless that intent is conveyed to the detainee. *See Mendenhall*, 446 U.S. at 555 n. 6.

In an analogous case to the pursuant matter, the Third Circuit ruled that there is no seizure when officers approached an individual in a train station and asked questions of that individual. *United States v. Lockett*, 406 F. 3d 207. Lockett was sitting on a bench at the 30th Street train station in Philadelphia, Pennsylvania when two officers approached him. The Officer showed Lockett his badge and asked if he would answer questions. Lockett replied that he would speak to the officer. The Officers asked Lockett his identity and then reviewed his identification and train ticket and returned them to Lockett. The Officer explained that they were looking for contraband and then questioned Lockett about his luggage. The Officers then received consent to search the defendant's luggage. In searching the luggage, the Officers located and two firearms and brick of marijuana. In reviewing the facts of *Lockett*, the Third Circuit ruled that no Fourth Amendment seizure occurred when police approached the defendant at a train station, identified

---

[3]The Third Circuit addressed this concern in *United States v. Thame*, 846 F.2d 200 (3d Cir. 1988). The Court posited whether an individual confronted by Federal Agents and asked for identification would feel free to ignore the agent's commands, but wrote, "we are not free to substitute our judgement on this question for the Supreme Court's." *Id.* at 202.

themselves as law enforcement officers, asked questions, and asked to search the defendant's bags. *Lockett*, 406 F. 3d at 211.[4]

In the case before the Court, the Officers were in their police cruiser when they initially contacted the defendant. Officer Muziol rolled down his window and asked the defendant if he could talk to him for a second. Officer Muziol never told the defendant to stop, nor gave any authoritive command to the defendant. The defendant was not instructed to come over to the car, nor was he summoned from the sidewalk. The defendant's movements or path of travel were not restrained by the Officers. The defendant stopped and willingly answered the Officer's questions. While the Officers were in a fully marked patrol vehicle, they did not activate the lights or siren on the vehicle. The Officers remained in the police vehicle. While the Officers had firearms, the weapons were never drawn; presumably, the defendant could not even see any firearms as the Officers remained seated in their cruiser. Given the testimony produced at the evidentiary hearing, the Government submits that the initial encounter between the Officers and the defendant was consensual in nature; the defendant was not seized and the Fourth Amendment was not implicated.

### B. Defendant's Momentary Compliance Prior to Flight Did Not Amount to Any Meaningful Submission to Police Authority.

At one point during the consensual encounter, Officer Muziol requested that the defendant place his hands upon the hood of the vehicle. The Government concedes that it is at this point when the police attempted to transform the conversation from a consensual encounter

---

[4]The Third Circuit reached a similar result in *Thame*, in ruling that questioning of a traveler by police officers, followed by a request to search the traveler's bags did not amount to a "seizure" of that traveler under the Fourth Amendment. The Court looked to factors such as: (1) the encounter took place in an open area; (2) his movement was not controlled or blocked; (3) nor was he identified as a suspect of a crime. *Thame*, 846 F.2d 200.

to a stop. The defendant, however, did not comply with this request. The Government submits that the analysis as to whether the defendant submitted to the authority of the Officers should begin at what transpired after Officer Muziol asked the defendant to place his hands on the hood of the vehicle. After Officer Muziol asked the defendant to place his hands on the hood of the police cruiser, his one or two steps towards the vehicle prior to his flight was insufficient to constitute "submission to authority." The defendant was not seized by the Officers until he voluntarily laid to the ground after the chase by the Officers.

It is well settled that there can be no Forth Amendment violation until a seizure has occurs. *California v. Hodari D.*, 499 U.S. 621 (1991). If the police make a show of authority and the suspect does not submit, there is no seizure. *Hodari D.*, 499 U.S. at 626. Additionally, an attempted seizure of a person is beyond the scope of the Fourth Amendment. *County of Sacramento v. Lewis*, 523 U.S. 833, 845 n. 7 (1998)[5].

In *United States v. Coggins*, 986 F.2d 651 (3d. Cir. 1993), the Third Circuit ruled that an individual submits to the police authority when told to sit down by an officer and the individual complies with the command.[6] *Id.* at 654. . In *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006)[7], the Third Circuit similarly found that an individual submitted to authority of a police

---

[5]*See also United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000) (pointing out that "attempted seizures" are beyond the scope of the Fourth Amendment); *Brendlin v. California*, 127 S. Ct. 2400, 2405 (2007)(noting that a person is only entitled to challenge the government's actions under the Fourth Amendment when he is actually seized under the above test).

[6]It is worth noting that, in *Coggins*, the seizure did not occur until Coggins asked the officer if he could leave and was told to sit down. Until that point, although the Agent asked to see Coggins' identification and plane ticket, the agent reviewed the documents and returned them, and then began to question another suspect, there was no exercise of authority by the agent and the encounter was consensual. *Coggins*, 986 F. 2d at 654.

[7]The Fourth Circuit addressed a factually similar case in *United States v. Brown*, 401 F.3d 588. In *Brown*, the Fourth Circuit ruled that a Fourth Amendment seizure occurred when the police told a suspect to place his hands on the hood of the car and he follows the command of the

officer after being told to place his hands on a police vehicle *and* the individual turns toward the vehicle and places (or moves to place) his hands on the vehicle in response to the officers commands.[8] *Id.* at 246 (emphasis added).

By contrast, in *United States v. Valentine*, the Third Circuit ruled that no seizure occurs when a suspect fails to obey the commands of an officer, even if the subject momentarily complies with the Officers commands. The Court wrote, "Even if Valentine paused for a few moments and gave his name, he did not submit in any realistic sense to the officer's authority." *United States v. Valentine*, 232 F.3d 350, 359 (3d Cir. 2000).[9] *Valentine*, unlike the facts in *Brown*, demonstrated no meaningful submission to the officer's authority.

The case before the Court is more akin to *Valentine* than it is to the *Brown* case. In *Brown*, the Officer was standing with the suspects. The Officer gave commands that limited the movement of the individual prior to the command to place his hands on the police cruiser; those instructions were followed. Additionally, the Officer suspected the defendant's of committing a crime and informed them that they were possible suspects. The Officer also told the two suspects that he was going to pat them down for his safety. There was some discrepancy as to whether the

---

officer because he submitted to showing of authority. *United States v. Everett Brown*, 401 F.3d at 594-595.

[8]The nature of the encounter between the Officer and Brown prior to the command is important. In *Brown*, two suspects, Brown and Smith, were detained by a Philadelphia Police Officer because he thought the two might be assailants in an attempted purse snatching. The two were told they were to stay and if they were not identified as the culprits, they would be free to leave; this necessarily implied they were not free to leave. Brown and Smith remained with the officer. Another significant fact is that the Officer told Brown and Smith that he was going to conduct a pat-down search, thus restricting their movement. *Brown*, 448 U.S. at 245.

[9]In *Valentine*, the Court concluded that the Officers had reasonable suspicion when they contacted the suspects. *Valentine*, 232 F.3d at 357. However, the Third Circuit went on to discuss why the District Court erred in ruling that the Officers required reasonable suspicion before ordering the suspects to stop. *Valentine*, 232 F.3d at 358.

11

suspects put their hands on the vehicle, but it is clear that both made a movement as if to put their hands on the vehicle.[10] *Brown*, 448 U.S. 239.

In *Valentine*, Officers approached the suspect after receiving an anonymous tip. The Officers, in a fully marked patrol vehicle, stopped the car near a group of individuals. The Officers exited the car. The individuals, including the suspect, began to walk away from the officers. One officer told a subject to stop. The individual with Valentine obeyed the commands by placing his hands in the air and walking towards the officers. Valentine, standing approximately ten feet from the officers, stated "Who me?" and charged towards the officers.[11] *Valentine*, 232 F.3d at 353.

In the case before the Court, the interaction between Officer Muziol and the defendant was consensual up to the point that the Officer asked the defendant to place his hands on the hood. Unlike the situation in the two *Brown* decisions, the defendant never demonstrated any intent to place his hands on the vehicle. The one or two small steps towards the vehicle did not amount to the same level of submission that occurred in *Brown*. The situation presented here is closer to *Valentine* in which the suspect displayed only a brief moment of hesitation before flight rather than any meaningful submission to the Officer's commands. Because the defendant did not comply with the Officer's command to place his hands on the hood of the vehicle in any meaningful sense, he was not seized.

The defendant in this case was not seized until he voluntarily submitted to the Officer's

---

[10] An observing officer testified that the suspect put his hands on the vehicle. The police report supports his version. The arresting officer testified that the suspect "made the intent" to put their hands on the top of the car, but they never did. *Brown*, 448 U.S. at 244.

show of authority after the foot chase concluded.[12] As in *Valentine*, the defendant's brief hesitation before flight was not sufficient to demonstrate submission to the authority of the officer. The defendant, after a chase by the officers and losing control of his firearm, submitted to the commands of Officer Rinehart by falling to the ground and laying face down. It is at this point that the defendant submitted to the Officer's show of authority.

### C. There is No Fourth Amendment Implication Regarding the Firearm.

In the instant case, the defendant failed to submit to the show of authority by police. As the defendant fled from police a firearm fell from the defendant's possession and was later recovered by police. It is irrelevant, in this particular case, whether the firearm was discarded or whether it was lost by the defendant.[13]

The Fourth Amendment to the United States Constitution protects, "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures..." U.S. Const. Amend. IV. In *Hodari D.*, Justice Scalia wrote, "assuming that [the

---

[12] At this point, the Officers had probable cause to arrest the defendant. In addition to the factors such as: high crime area, late at night, nervousness, flight; the defendant was carrying a concealed deadly weapon. Although it is not a crime to carry a concealed weapon in Delaware with an appropriate license, to do so without such a license is a criminal offense. *See* 11 *Del. C.* § 1442. Importantly, the Supreme Court of Delaware has held that, in proving a violation of this section, the prosecution does not have the burden to establish that the defendant lacked a license to carry a concealed weapon. *See Lively v. State*, 427 A.2d 882, 884 (Del. 1981). Whether or not an individual had a license to carry the concealed weapon in question is an affirmative defense to the charge, which the defendant has the burden of proving. *Id.* at 884; *compare United States v. Bond*, 173 Fed. Appx. 144, 146 (3d Cir. March 23, 2006) (concluding that police had probable cause to arrest an individual who they saw with a handgun under a similar provision of Pennsylvania law).

[13] During the Evidentiary Hearing, the Court referenced *United States v. Fulani*, 368 F. 3d 351. (T. 49). The Government submits that because the defendant was not seized when the firearm was lost/discarded, there is no 4th Amendment protection, thus *Fulani* does not apply.

officer's] pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled. *Hodari D.*, 499 U.S. 629.

In the case before the Court, the defendant failed to submit to the Officer's show of authority. At the point the firearm fell from the defendant waist-area, he was not seized by the police. As such, there is no Fourth Amendment implication.

### IV. CONCLUSION.

The Government respectfully asserts that the defendant's argument lacks merit. The initial contact by the Officers amounted to a consensual encounter; the defendant did not submit to the officers commands; and, the Officers had reasonable suspicion to detain the defendant for investigatory purposes when he did surrender. Finally, there was no seizure when the defendant lost control of his weapon; therefore, there is no Fourth Amendment implication.

WHEREFORE, the United States respectfully asks the Court to deny the Defendant's Motion.

                Respectfully submitted,

                COLM F. CONNOLLY
                United States Attorney

                By: /s/ Shawn Martyniak
                Shawn E. Martyniak (De. I.D. No. 4433)
                Special Assistant United States Attorney
                1007 Orange Street, Suite 700
                Wilmington, Delaware 19899-2046

Dated: June 13, 2008.

IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal Action No. 08-08-GMS |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| THOMAS J. SMITH, | : | |
| | : | |
| Defendant. | : | |

**ORDER**

The Court, having considered the Government's *Response* to the Defendant Smith's *Motion to Suppress Evidence and Statements*:

IT IS HEREBY ORDERED this _____ day of _____, 2008, that the Defendant's motion is denied for the reasons stated in the Government's response.

_____
The Honorable Gregory M. Sleet
United States District Court.