## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA      :

               :     Criminal Action No. 08-08-GMS

         Plaintiff,       :

   v.                     :

                    :

THOMAS J. SMITH,          :

                    :

         Defendant.     :

### GOVERNMENT'S REPLY BRIEF TO DEFENDANT'S *MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS*

The United States, by and through attorneys Colm F. Connolly, United States Attorney

for the District of Delaware, and Shawn E. Martyniak, Special Assistant United States Attorney

for the District of Delaware, for the reasons set forth below, respectfully requests that the

Defendant's *Motion to Suppress Physical Evidence and Statements* be denied.

### I. INITIAL ENCOUNTER WITH WILMINGTON OFFICERS WAS CONSENSUAL IN NATURE.

As stated in the Government's post-hearing response, the initial encounter between the

Wilmington Police Officers and the defendant was consensual in nature. Within the defendant's

*Memorandum*, reference is made to the seizure of the defendant prior to his flight.[1] The Supreme

Court has ruled that police officers are allowed to ask questions of anyone without having any

evidence creating suspicion.[2] Furthermore, Officers may ask questions of individuals, even if

---

[1] "Mr. Smith...was seized by police for no reason other than his hands in his pockets." (Def. B. 3). "...Mr. Smith initially yielded to officer's authority, at first by remaining stopped and answering all of Officer Muziol's questions." (Def. B. 5).

[2] *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

they have no basis for suspecting the individual is engaged in any criminal conduct.[3]  The
interaction between the Officer Muziol and the defendant is the type of encounter the Supreme
Court and the Third Circuit have recognized as the type of police citizen interaction that requires
no objective justification.[4]

      The Defendant relies on *Johnson v. Campbell*, 332 F.3d 199 (3d Cir. 2003) and *United
States v. Coggins*, 986 F.2d 651 (3d Cir. 1993) for the proposition that the Officer's repeated
questions amounted to a seizure of the defendant.  Neither *Johnson* or *Coggins* is analogous to
the case before the Court.  In *Johnson*, a police officer approached Johnson, who was seated in
the driver's seat of a van.  The Officer approached the van and gestured to Johnson to roll down
his window; the officer then told Johnson that he "was being detained."  Johnson, merely stared
at the Officer and did not comply with the request.  The Officer then asked for identification,
which Johnson refused to provide.  The Officer continued to demand Johnson's identification.
*Johnson*, 332 F.3d at 203.  In *Coggins*, the defendant and co-conspirators were stopped by a DEA
agent in an airport stairwell.  As the agent questioned a co-conspirator, Coggins asked to use the
bathroom, the DEA agent declined Coggins' request.  Later, Coggins stood up and again
requested to use the bathroom; the agent refused this second request as well.  Coggins then fled.
*Coggins*, 986 F.2d at 652-53.

      Initially, neither Officer Muziol nor Officer Rinehart gave any command to the defendant

---

[3]*United States v. Lockett*, 406 F. 3d 207, 211 (3d Cir. 2005).

[4]*United States v. Drayton*, 536 U.S. 194 (2002)(no Fourth Amendment violation when
officers question willing individuals on the street). *United States v. Henderson*, 123 F.Appx. 459
(3d Cir. 2005)(not precedential) (no seizure when uniformed officer exited his fully marked
patrol vehicle with his hand on his revolver, approached suspect, asked for identification, and
asked to pat the suspect down for weapons).

requiring compliance of any sort. As in *Drayton*, the officers gave the defendant, "no reason to believe that [he was] required to answer the officers' questions." *Drayton*, 536 U.S. 194, 203 (2002). Additionally, unlike the facts in *Johnson*, this defendant never gave any indication that he did not desire to answer the Officer's questions and, unlike Coggins, this defendant was never told he had to remain with the officers.

The defendant also sought to distinguish this case from the factual scenario in *United States v. Thame*, 846 F.2d 200 (3d Cir. 1988). The defendant admits that the court found the encounter in *Thame* was not coercive, "because of the public nature of the police questioning." (Def. B. 5, fn1). Here, the defendant was on a public sidewalk and the Officers were in a vehicle on a public street. There are few places more of a public nature than sidewalks and streets.

In the case before the Court, neither officer ever told the defendant he had to stop or remain in the area. The defendant was never told he was not free to leave. Officer Muziol never required the defendant to answer his questions. The location of the conversation in this case took place in the most public of places. As stated in the Government's post-hearing response, the defendant stopped and willingly answered Officer Muziol's questions. The initial encounter between the Officers and the defendant was consensual in nature; the defendant was not seized and the Fourth Amendment was not implicated.

## II. THE DEFENDANT WAS NOT SEIZED WHEN HE TOOK ONE OR TWO STEPS TOWARD THE POLICE VEHICLE

The defendant was not seized when he took one or two steps toward the police vehicle as his momentary compliance did not amount to any meaningful submission to authority. The defendant writes, "at the latest, Mr. Smith was seized when he complied with Officer Muziol's

3

orders, and took steps toward the police vehicle..." (Def. B. 5). The Government asserts that this momentary compliance did not amount to any submission by the defendant.

The defendant relies on *United States v. Brown*, 448 F. 3d 239 (3d Cir. 2006), arguing that, similar to *Brown*, the defendant's initial submission was not undercut by his subsequent attempt to flee. This case is factually distinct from *Brown*. In *Brown*, a Philadelphia police officer approached Brown as he and an associate were hailing a taxi cab. The officer told the taxicab to keep moving and told the two that they were robbery suspects. By telling their cab to move on and instructing the two to wait for the victims of the robbery, the officer implied that Brown was not free to leave. Up to this point, Brown and his friend obeyed the commands of the officer.

The officer then informed the two he was going to pat them down; the officer testified that he planned to pat the two down regardless of their compliance. It is worth noting that the officer, in *Brown*, was on the street when giving commands and not in a vehicle. *Brown*, 448 F.3d at 242-43. In *Brown*, the officer told the defendant's cab to move on, the two were told that they could not leave until the robbery victims cleared them as suspects, the two were told they were going to be patted down, and Brown placed his hands (or moved to place his hands) on the vehicle. The stop in *Brown* was considerably longer than the time between Officer Muziol's command and the defendant's flight in the case at bar.

The case before the Court is similar to *United States v. Valentine*, 232 F.3d 350 (3d Cir. 2000). In *Valentine*, the defendant responded to an officer's questions by stating "who me?", thus momentarily complying with the officer's command. Valentine then charged towards the officer. *Valentine*, 232 F.3d at 353. Valentine's brief compliance, by responding to the Officer's

4

inquiries was not sufficient to demonstrate submission to authority.

In the case at bar, the encounter was entirely consensual up to the point that Officer Muziol requested the defendant place his hands on the car. The only event to take place after the authoritative command was the defendant taking one or two steps toward the vehicle followed by his flight. The Government submits that this is not the lengthy event that took place in *Brown*, but rather similar to brief compliance to authority demonstrated in *Valentine*.

### III.  THE OFFICER'S HAD REASONABLE SUSPICION TO STOP THE DEFENDANT.

The defendant was not seized until he laid to the ground and submitted to the Officer's commands. The defendant contends, "the officer's justified their stop of Mr. Smith by asserting only that Mr. Smith was outside with his hands in his pockets...and that he was located in a high crime area, which also serves as a residential neighborhood." (Def. B. 7). The Government argues that this analysis is incorrect. The analysis to determine if "reasonable suspicion" exists begins at the time of arrest or seizure. In this case, the analysis begins when the defendant laid face down obeying Officer Rinehart's commands.

In determining if reasonable suspicion exists, "it is necessary to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense was being committed." *United States v. Glassner*, 750 F.2d 1197, 1206 (3d Cir. 1984). In evaluating reasonable suspicion, the totality of the circumstances should be considered. *United States v. Sokolow*, 490 U.S. 1, 8 (1989).

In the case at bar, the Officers were traveling in a high crime area at 3:00 a.m. The defendant was the only individual on the street. The defendant, while agreeing to speak with the

5

officers, was unable to provide any identification. The defendant gave a non-responsive answers to Officer Muziol's inquiries several times. The defendant stood at a forty-five degree angle to the police vehicle and kept his right side away from the Officers. The defendant's left hand was shaking and the defendant appeared to be nervous. After the Officers asked the defendant to place his hands on the hood of the vehicle, the defendant took one to two small steps forward and then fled.[5] During the pursuit, Officer Rinehart saw what appeared to be a firearm fall from the defendant's right side. Officer Rinehart yelled for the defendant to stop, but the defendant continued to flee for several more yards. The defendant then fell to the ground and remained face down.

The defendant was not arrested or seized until he laid down on the pavement, following Officer Rinehart's commands. Given all of the facts available to the Officers at the time the defendant submitted to their authority, it is clear that the Officers had reasonable suspicion to believe a crime had been committed.

## IV.  THERE IS NO FOURTH AMENDMENT IMPLICATION REGARDING THE FIREARM.

The government contends that there is no Fourth Amendment Protection regarding the recovered firearm. The defendant claims, in essence, he has a privacy interest in the firearm because he did not abandon it. As stated in the Government's post-hearing response, it is irrelevant whether the firearm was discarded or whether it was lost by the defendant.

In *United States v. Valentine*, the Third Circuit pointed out that "attempted seizures" are

---

[5]What a suspect does after he fails to comply with an officer's commands can be considered in evaluating reasonable suspicion. *Valentine*, 232 F.3d at 359. *See also United States v. Johnson*, 212 F.3d 1313 (D.C. Cir. 2000); *United States v. Smith*, 217 F.3d 746 (9th Cir. 2000); and *United States v. Santamaria-Hernandez*, 968 F.2d 980 (9th Cir. 1992).

beyond the scope of the Fourth Amendment.[6] *Valentine*, 232 F.3d at 358. In the case before the Court, at the point the firearm fell from the defendant, he was not seized by the police. Once the firearm fell from the defendant, it was in plain view of the officer. The Government submits that it cannot be the case that an individual has a Fourth Amendment privacy interest in a firearm that is located in plain view in a public space. Prior to his seizure by Officer Rinehart, the recovered firearm was dropped in the parking lot of a community center and was in plain view of Officer Rinehart. As such, there is no Fourth Amendment implication in the recovery of the firearm.

## IV. CONCLUSION.

The Government respectfully reasserts its argument that the defendant's claims lack merit. The initial contact by the Officers amounted to a consensual encounter; the defendant did not submit to the officers commands; and, the Officers had reasonable suspicion to detain the defendant for investigatory purposes when he did surrender. Finally, there was no seizure when the defendant lost control of his weapon; therefore, there is no Fourth Amendment implication.

---

[6]*See also, United States v. $32,400 in United States Currency*, 82 F.3d 135, 139 (7th Cir. 1996) and *County of Sacramento v. Lewis*, 523 U.S. 833, 845 n. 7 (1998).

WHEREFORE, the United States respectfully asks the Court to deny the Defendant's

Motion.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

By:     /s/ Shawn Martyniak
Shawn E. Martyniak (De. ND. No. 4433)
Special Assistant United States Attorney
1007 Orange Street, Suite 700
Wilmington, Delaware 19899-2046

Dated: June 30, 2008

8

## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal Action No. 08-08-GMS |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| THOMAS J. SMITH, | : | |
| | : | |
| Defendant. | : | |

## ORDER

The Court, having considered the Government's *Response* to the Defendant Smith's

*Motion to Suppress Evidence and Statements*:

IT IS HEREBY ORDERED this _____ day of _____, 2008, that the Defendant's

motion is denied for the reasons stated in the Government's response.


_____
The Honorable Gregory M. Sleet
United States District Court.