IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No.  08-08 GMS |
| | ) | |
| THOMAS J. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

**I.    INTRODUCTION**

On January 22, 2008, the Grand Jury for the District of Delaware indicted Thomas J. Smith ("Smith") on one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2) and one count of knowing possession of a controlled substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. § 844(a). Presently before the court is Smith's Motion to Suppress Physical Evidence and Statements. The court held an evidentiary hearing in connection with this motion on May 29, 2008. The court subsequently directed the parties to file proposed findings of fact and conclusions of law. After having considered the testimony elicited during the hearing and the arguments presented in the parties' submissions on the issues, the court will grant Smith's motion.

**II.    FINDINGS OF FACT**

At the evidentiary hearing, the United States called one witnesses: Michael Rinehart ("Rinehart"), an officer with the Wilmington Police Department (the "WPD"). Smith did not call any witnesses. After listening to the testimony of the witness, and observing his demeanor, the court concludes that Rinehart's account of the facts is credible. The following represents the court's essential findings of fact as required by Rule 12(e) of the Federal Rules of Criminal Procedure.

At approximately 3:15 a.m., on January 8, 2008, Rinehart was on duty with Officer Muziol ("Muziol") in the 16th district, around the 600 block of Madison Street, patrolling the area. (See Transcript of Hearing on Defendant's Motion to Suppress ("Tr.") at 3-9.) Both Rinehart and Muziol were dressed in full uniform and riding in a fully marked WPD vehicle. (Id. at 4-5.) The officers were conducting high-visibility patrols in the area, due to recent criminal activity. (Id. at 8.) Their Lieutenant had instructed them to stop and identify anyone that was out walking in the area, find out where they were going, what they were doing outside, and to make their presence known. (Id. at 8, 22.)

Rinehart and Muziol first saw Smith walking southbound on Madison Street from Seventh Street toward Sixth Street. (Id. at 8.) The officers then stopped Smith to speak to him and find out his identity.[1] (Id. at 9.) Muziol stopped the patrol vehicle approximately one to two feet from where Smith was walking and asked Smith "can I talk to you for a second?" (Id. at 9, 24-25.) Smith stopped and turned at a 45 degree angle to face the patrol vehicle. (Id. at 9, 24.) Muziol asked Smith whether he had any identification, to which he responded "no." (Id. at 9-10, 24.) Muziol further questioned Smith, asking him where he was heading. (Id. at 10, 24.) Smith responded that he was heading to his girl's house. (Id. at 10.) There was a brief pause, and Muziol asked "[w]here is your girl's house," to which Smith responded "I am heading to my girl's house." (Id.) Muziol repeated the question "where is your girl's house" several times, and Smith always responded by saying he was going to his girl's house. (Id.)

---

[1] The officers did not stop Smith in response to any complaint from a resident, but rather, because they were ordered to make their presence known. (Tr. at 8, 22.)

Muziol then asked Smith to place his hands on the hood of the patrol vehicle, so that Muziol and Rinehart could ascertain his identification, conduct further identification checks, and see where he was heading.[2,3] (Id. at 10, 28.) Smith responded by taking two steps toward the vehicle. (Id. at 11, 28.) After Smith took his first step toward the vehicle, either one or both of the officers clicked the latch on the door to get out and Smith turned and began running southbound on Madison Street toward Sixth Street. (Id. 11-12, 28-29.) Because both officers were still in the vehicle, Muziol put it into reverse, activated the emergency lights and began following Smith. (Id. at 12, 29.) Rinehart placed a radio dispatch to the center advising them that he and Muziol had a subject fleeing on foot. (Id. at 13.)

The officers continued the chase and the vehicle was parallel with Smith by the time he got to the corner of Sixth and Madison Streets. (Id. at 30.) Smith crossed Sixth Street, began running westbound into a parking lot, and attempted to scale a six-foot chain-link fence in the lot. (Id. at 13, 32.) Smith got his two hands up onto the fence, but then fell back down. (Id. at 14, 34.) While Smith attempted to scale the fence, Rinehart was able to exit his vehicle. (Id. at 14.) At this point, Smith turned around and began running northbound through the lot. (Id.) While Smith was running, Rinehart observed what he believed to be a firearm fall from Smith's right side toward the waistband

---

[2] Rinehart testified that he did not notice anything during the initial encounter that would cause him to believe Smith had a weapon. (Tr. at 25.)

[3] According to Rinehart, Muziol asked Smith to place his hands on the hood of the patrol vehicle, because neither he nor Muziol "knew what was going on, why [Smith] kept giving us the same answer to different questions." (Id. at 10.) Rinehart later testified that he told Muziol to ask Smith to place his hands on the vehicle because he had noticed that Smith would not turn his right side towards the patrol vehicle, Smith pointed his left hand instead of his closer right hand when indicating to the officers that he was traveling south, and Smith's left hand was shaking when he lowered it after pointing. (Id. at 10-11.)

of his pants.[4]  (Id. at 14, 35.)  Rinehart gave chase and verbally commanded Smith to stop.  (Id. at 16.)  Smith ran a short distance further and then dropped to the ground.  (Id. at 16, 36.)  Rinehart attempted to place Smith into custody, but Smith resisted.  (Id. at 16, 37.)  Rinehart responded by giving Smith a stun blow to the back of the head to gain control.  (Id. at 16, 37-38.)  The officers then were able to take Smith into custody.  (Id. at 17.)

After taking Smith into custody, Rinehart responded back to the area where he saw the object fall, and located a black Model 19 Glock semiautomatic handgun approximately two yards from where Smith fell off the fence.  (Id.)

The officers transported Smith to the WPD station for processing.  (Id. at 40.)  During processing, Rinehart asked Smith if there was anything else he needed to tell Rinehart.  (Id. at 41.)  Smith answered that he had approximately one gram of crack cocaine in his pocket.  (Id.)  After Smith made that statement, Rinehart Mirandized him and asked him to make a statement.  (Id.)  Smith declined to make anymore statements.  (Id.)

### III. DISCUSSION

In his motion to suppress, Smith contends he was unlawfully seized when Muziol began repeatedly asking him the same question, to which he had already responded.  Smith further argues that he submitted to Muziol's authority a second time, by taking steps toward the hood of the patrol vehicle in compliance with Muziol's instruction to place his hands on the hood of the vehicle.  The government disagrees and contends that Smith's initial encounter with the officers was consensual, and that he was not seized until he submitted to Rinehart's show of authority after the foot chase

---

[4] Rinehart observed the item fall from Smith's pants.  He did not see Smith physically throw or discard anything during the chase.  (Tr. at 36-37.)

concluded. The court must, therefore, determine whether Smith was seized at any time prior to his voluntary submission.

The Fourth Amendment's protection against unreasonable seizures includes a seizure of the person. *California v. Hodari D.*, 499 U.S. 621, 624 (1991). A person is seized for *Terry v. Ohio* purposes when, "taking into account all of the circumstances surrounding the encounter, the police conduct would . . . 'communicate[] to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (quoting *Kaupp v. Texas*, 538 U.S. 626 (2003)). That is, a seizure occurs when there is either (a) "a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful," or (b) "submission to the assertion of authority." *Hodari D.*, 499 U.S. at 626; *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968). It is well established, however, that a seizure does not occur when an officer approaches an individual in a public place, identifies himself as a law enforcement agent, and asks questions. *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005) (citations omitted). Further, law enforcement officers may pose questions and ask for identification even when they have no basis for suspecting a particular individual, as long as they do not use coercive measures to secure cooperation. *See id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)). The Fourth Amendment, however, requires an officer to be able to articulate specific facts justifying an intrusion "when the interaction ceases to be consensual, that is, when a reasonable person would no longer 'feel free to decline the officers' requests or otherwise terminate the encounter.'" *Johnson*, 332 F.3d at 205. Finally, "[a]ttempted seizures of a person are beyond the scope of the Fourth Amendment." *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 n. 1 (1998)). In other words, there is

no seizure if the police make a show of authority and the defendant does not submit. *Valentine*, 232 F.3d at 358.

In the present case, Rinehart and Muziol stopped Smith as he was walking down the street to make their presence known, speak to him, and find out his identity. After Muziol initiated the encounter, Smith stopped walking and turned to face the patrol vehicle. Muziol asked Smith a few questions, including where he was going, which he answered by stating "to my girl's house." When Muziol asked Smith where his girl's house was located, Smith responded "I am heading to my girl's house." Muziol repeatedly asked Smith where his girl's house was located, prompting Smith to respond every time that he was heading to his girl's house. Not satisfied with the response to his question, Muziol instructed Smith to place his hands on the hood of the patrol vehicle. Smith initially complied by taking two steps toward the vehicle, but then turned and ran away from the officers. Based on the evidence and facts presented, the court finds that Muziol seized Johnson for purposes of the Fourth Amendment the moment he began to repeat the question "Where is your girl's house" to Smith. *See Johnson v. Campbell*, 332 F.3d 199 (3d Cir. 2003).[5] At that point in

---

[5] In *Johnson*, a civil case, the plaintiff claimed that an officer with the Dewey Beach Police Department (the "DBPD") lacked reasonable suspicion to seize him. *Id.* at 201. Johnson was a guest at a Dewey Beach motel and stopped into the motel office after arriving. *Id.* The clerk on duty believed that Johnson was acting suspicious and had her husband call the DBPD to check on her welfare. *Id.* When the officers arrived at the motel, the clerk gave a description of the suspicious looking guest. *Id.* at 202-03. One of the officers left the motel office to search for a man matching the description and found Johnson, who matched the description, sitting in the driver's seat of a green van reading a newspaper. *Id.* at 203. The officer approached the van, and gestured to Johnson to roll down his window. *Id.* Johnson did not comply. *Id.* After the officer asked several more times, Johnson rolled down the window a few inches. The officer asked for identification, which Johnson refused to provide. *Id.* Further conversation ensued, and Johnson eventually was arrested for disorderly conduct. *Id.* On appeal, Johnson argued that he was seized at the moment the officer asked him to roll down his window. *Id.* at 206. The officer argued that the stop began at some point after Johnson repeatedly refused to cooperate with his orders. *Id.*

time, neither Smith, nor a reasonable person would feel free to ignore Muziol's question or terminate the encounter with the officers.[6,7]

---

The Third Circuit, therefore, had to determine, among other issues, at what moment Johnson was seized. *Id.* at 205. The court concluded that the answer to that question occurred somewhere between both parties' positions – that is, not at the exact moment of the encounter, but also not after Johnson repeatedly failed to comply with the officer's orders. *Id.* at 206. According to the court, the seizure occurred at the moment when it became clear that Johnson could not refuse the officer's requests. *Id.* Put differently, the court sated: "Although Johnson may have felt free to decline . . . [the officer's] initial request to roll down the window, the very next moment, when [the officer] persisted rather than accepting Johnson's choice not to acquiesce, the interaction became a stop. At that time, [the officer] made it clear that Johnson was not free to ignore him and would not be left alone until he complied." *Id.* The officer's stop of Johnson is analogous to the facts in the present case. Here, as already discussed, even though Smith answered Muziol's question regarding where his girl's house was located, Muziol, not satisfied with Smith's response, persisted in repeating the same question rather than acquiescing. At that point in time, Muziol made it clear that Smith was not free to ignore him and would not be left alone until he complied.

[6] The crux of the government's argument is that the transaction between the officers and Smith was consensual until the point that Muziol instructed Smith to place his hands on the hood of the vehicle. As previously discussed, the court disagrees with this argument in light of the facts adduced during the suppression hearing. The government, however, also articulates a further reason why the court should deny the motion to suppress: Muziol's instruction to Smith to place his hands on the hood of the vehicle was a show of authority to which Smith did not submit. The court finds this argument unavailing as well. Here, the court concludes, and both parties agree, that there was a clear showing of authority when Muziol instructed Smith to place his hands on the vehicle. The court further concludes that Smith initially submitted to this show of authority when he took two steps toward the police vehicle in compliance with Muziol's instruction. *Cf. United States v. Brown*, 448 F.3d 239, 246 (3d. Cir. 2006) (determining, under similar facts, that the defendant initially complied with a show of authority "by turning to face the police car and placing (or moving to place) his hands on the vehicle before attempting to flee"). Moreover, Smith's initial submission was more than momentary, and not undercut by his subsequent attempt to flee the officers. *Id.*; *see United States v. Coggins*, 986 F.2d 651, 652-54 (3d Cir. 1993).

[7] The court finds the facts of this case troubling and notes that at the time of contact with police officers, there is very little that this defendant could have done to prevent his seizure. Here, although the officers' observations did not ripen into any reasonable, articulable suspicion during the course of questioning, Muziol instructed Smith to place his hands on the hood of the vehicle. Had Smith acquiesced to Muziol's command, he would have been seized even though the officers had no adequate basis to seize him, and that seizure would have violated his Fourth Amendment rights. *See Terry*, 392 U.S. at 30. *Hodari D.* seems to recognize this risk, but errs

Here, Muziol's repeated questioning of Smith resulted in a seizure for purposes of the Fourth Amendment. Because the officers did not have reasonable suspicion that criminal activity was afoot when they seized Smith, the court will grant Smith's motion to suppress all physical evidence and statements stemming from his unlawful seizure.[8]

Dated: July 29, 2008                              /s/ Gregory M. Sleet
                                                  CHIEF, UNITED STATES DISTRICT JUDGE

---

on the side of compliance with police orders. 499 U.S. 621, 627 (1991) ("Street pursuits always place the public at some risk, and compliance with police orders to stop should therefore be encouraged. Only a few of those orders, we must presume, will be without adequate basis, and since the addressee has no ready means of identifying the deficient ones, it almost invariably is the responsible course to comply.")

[8] Smith further argues that he is entitled to Fourth Amendment protection concerning the firearm, as it was not abandoned. The government does not disagree or provide any argument regarding abandonment. Indeed, the government argues that the Fourth Amendment does not apply to the firearm, because Smith failed to submit to Muziol's show of authority. Having already determined that Smith was unlawfully seized prior to the time the firearm fell out of his pants, the court need not address this secondary issue.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No.   08-08 GMS |
| | ) | |
| THOMAS J. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

## **ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Suppress Physical Evidence and Statements (D.I. 12) is GRANTED.

Dated: July 29, 2008                /s/ Gregory M. Sleet
                                    CHIEF, UNITED STATES DISTRICT JUDGE